Eugene B. KASSMAN

v.

The AMERICAN UNIVERSITY.

Appeal of Lloyd ULTAN.

No. 75–1125.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 11, 1975.

Decided Nov. 19, 1976.

Anthony C. Morella, Washington, D. C., with whom William J. Donnelly, Jr., Rockville, Md., was on the brief, for appellant.

Glenn H. Carlson, Washington, D. C., with whom Daniel G. Grove, Washington, D. C., was on the brief, for appellee Kassman.

Before TOM CLARK,* Associate Justice of the Supreme Court of the United States (Ret.), BAZELON, Chief Judge, and ROBINSON, Circuit Judge.

PER CURIAM:

Our appellant is Lloyd Ultan, Chairman of the Department of Music in the College ·of Arts and Sciences of American University. Our appellee is Eugene B. Kassman, formerly Director of Special Education Projects for the Performing Arts at the University. The appeal is from a judgment for damages entered by the District Court on a verdict finding that Ultan wrongfully interfered with the contractual relationship between Kassman and the University. Of the several grounds Ultan urges for reversal, only one calls for modification of the judgment. Affirming it, then, in other respects, we remand the case to the District Court for application on the judgment of a credit for the amount paid Kassman by the University in settlement of another lawsuit stemming from termination of his connection with the University.

I

Kassman was appointed to his former position at the University on a one-year

* Sitting by designation pursuant to 28 U.S.C. § 294(a) (1970).

contract which became effective in July, 1970. His major responsibility was the development and administration of an educational program to be conducted in conjunction with a series of summer performances by students and distinguished artists at Wolftrap Farm Park for the Performing Arts (Wolftrap). Kassman's contract was extended by the University for an additional year but, in June, 1972, the Dean of the College of Arts and Sciences notified Kassman that the contract would not be renewed for the 1972–73 academic year, although he was then given a special contract covering the first two months of that year. When Kassman left the University, there was still a year remaining on its three-year contract with Wolftrap for the joint program.

The non-renewal of Kassman's contract occurred after a series of disagreements between Ultan and Kassman which culminated on December 3, 1971, in a memorandum to the Dean from Ultan and the faculty of the Department of Music. That memorandum stated that there had been "numerous frustrations, incompetencies, indignities, and discourtesies" in connection with the University-Wolftrap program, and referred to Kassman as a person of "proven incompetence and ineffectiveness".[1]

In November, 1972, Kassman filed suit in the District Court against Ultan and the University charging libel and wrongful interference with his contractual relationship with the University. A month later, Kassman filed a second suit in the Superior Court of the District of Columbia against the University, as sole defendant, for breach of contract allegedly arising from

the failure of the University to renew his contract and to follow certain procedures in connection therewith.[2] That suit was settled for $5,000, and dismissed with prejudice, prior to trial of the instant litigation.[3]

At trial in the District Court, Kassman introduced evidence tending to show that there had been a pattern of conduct by Ultan manifesting ill will, and that Ultan had deliberately sought his removal as director of the program. Kassman also endeavored to demonstrate that the non-renewal of his contract was the direct result of Ultan's activities. Ultan, on the other hand, denied responsibility for Kassman's discharge, and introduced evidence indicating that his actions were taken out of concern for the program and in furtherance of his duties as Chairman of the Department of Music.

The District Court directed verdicts in favor of the University on both the libel and interference-with-contractual-relationship counts, and in favor of Ultan on the libel count.[4] The jury returned a verdict for Kassman on the interference count, awarding him $15,000 as compensatory damages. After trial, the court denied Ultan's separate motions for a judgment notwithstanding the verdict[5] and for a credit on the judgment of $5,000, the amount of the settlement in the breach-of-contract action in the Superior Court between Kassman and the University.[6]

II

■ Two of the points which Ultan tenders on appeal were not urged in the

---

1. J.App. 517–518. The memorandum did not refer to Kassman by name, but Ultan stated at trial that the reference was to Kassman. J.App. 436.

2. J.App. 24–31.

3. J.App. 32. Although Kassman's complaint in the District Court was captioned only as one for libel and interference with the contractual relationship, the University contended that in some aspects it presented claims for breach of contract. The University moved for partial summary judgment, asserting that any cause of

action for breach of contract was res judicata, having been the subject of the Superior Court suit by Kassman against the University. The District Court granted the motion, holding that the contract claims had been settled and dismissed in the prior litigation. J.App. 33–34.

4. J.App. 559–560. Kassman does not appeal from that action.

5. J.App. 559–560, 584.

6. J.App. 585.

District Court. One[7] is that the interference alleged in this case was not with a contractual relationship, but with a prospective advantage—that growing out of renewal of Kassman's annual contract. For that claim, Ultan asserts, Kassman would be required to produce evidence that renewal of his contract was likely, which Kassman did not undertake to do. Despite adequate opportunity, Ultan never indicated to the District Court that the case should be tried on that theory, or not tried as it was.

■ Litigative theories not pursued in the trial court ordinarily will not be entertained in an appellate tribunal.[8] And "[q]uestions not properly raised and preserved during the proceedings under examination . . . will normally be spurned on appeal."[9] To be sure, each of these principles gives way to a preeminent interest of justice,[10] but we are unable to discern any here. The trial judge's instructions to the jury, although at times couched in terms of contract interference, made it clear that the central issue in the case was the renewal of Kassman's contract.[11] The jury was also specifically instructed that the University could legally have refused to renew the contract without giving any reasons, and that a verdict for Kassman necessitated a prior finding by the jury that Ultan's conduct caused its non-renewal.[12] Our attention has not been directed to any evidence suggesting that, even without that conduct, Kassman's contract likely would

not have been renewed. Since, then, no "clear miscarriage of justice [is] apparent from the record,"[13] we do not consider the point further.

■ It is also argued that there was inadequate evidence to carry two crucial issues to the jury. Specifically, Ultan asserts that there was insufficient evidence to show that his conduct was unprivileged—that is, that it occurred outside the scope of his employment, or within the ambit of employment but with malice—or that it was causally related to non-renewal of Kassman's contract. We recognize that both of these factors are necessary elements of the tort of interference with contractual relations.[14] Our function on review of this contention, however, is limited; where the case rests on controverted facts and turns on the credibility of the witnesses, it is peculiarly one for the jury.[15] Our careful review of the record satisfies us that there was ample evidence from which the jury could have concluded that Ultan acted without justification, and that his actions were the proximate cause of the non-renewal of Kassman's contract.

### III

The remaining issue is whether the District Court erred in refusing to credit on the judgment the amount which Kassman received from his settlement with American University. Ultan asserts that the credit should have been granted because the caus-

7. We discuss the other unraised point in note 12 *infra.*

8. *Miller v. Avirom,* 127 U.S.App.D.C. 367, 369–370, 384 F.2d 319, 321–322 (1967), and cases there cited.

9. *Id.* at 369–370, 384 F.2d at 321–322 (footnotes omitted).

10. *Id.* at 370, 384 F.2d at 322, and cases there cited.

11. J.App. 542–556.

12. J.App. 549–550. Ultan also maintains that his actions were absolutely privileged and that, if taken within the scope of his employment, malice was irrelevant. Not only did Ultan not bring this claim to the attention of the District Court but he indicated in his proposed jury

instructions and in his motion for judgment notwithstanding the verdict that he had only a qualified privilege. R. 66; J.App. 562–563.

13. *Miller v. Avirom, supra* note 12, 127 U.S. App.D.C. at 371, 384 F.2d at 323, quoting *Helvering v. Rubinstein,* 124 F.2d 969, 972 (8th Cir. 1942).

14. *Dunn v. Cox,* 163 A.2d 609, 611 (D.C.Mun. App.1960).

15. *Ellis v. Union Pac. R.R.,* 329 U.S. 649, 653, 67 S.Ct. 598, 600, 91 L.Ed. 572, 576–577 (1947); *Zaiko v. District of Columbia,* 138 U.S.App. D.C. 336, 338–339, 427 F.2d 606, 608–609 (1970); *Capital Transit Co. v. Bingman,* 94 U.S. App.D.C. 75, 76–77, 212 F.2d 241, 242 (1954).

es of action respectively pressed in the Superior Court and District Court suits arose out of the same transaction. Ultan further argues that if Kassman is allowed to realize the full amount of both judgments, he will be unjustly enriched. Kassman counters these contentions on the merits and also maintains that there is a procedural barrier to granting a credit here. More particularly, Kassman states that a motion for a credit on a judgment is a motion to amend or alter the judgment under Federal Civil Rule 59(e), and should have been made within ten days of its entry.[16]

■ We first address Kassman's procedural objection, and find his argument unpersuasive. We have previously held, contrarily to Kassman's thesis, that a motion for a credit on a judgment should be treated as a Rule 60(b)(5) motion for relief from a judgment which has been satisfied, released or discharged.[17] Motions of that character need only be made "within a reasonable time," [18] and the motion here clearly met that requirement.[19] We note further that Ultan raised the issue of the credit in the District Court prior to entry of the judgment.[20] The court was thus cognizant

of Ultan's position and could have ruled on it without the formality of a repetitious post-judgment motion. We turn to the merits of Ultan's claim for a credit.

## IV

■ As we have hitherto had occasion to declare, "[a] cardinal principle of law is that in the absence of punitive damages a plaintiff can recover no more than the loss actually suffered." [21] For "when the plaintiff has accepted satisfaction in full for the injury done him, from whatever source it may come," we said, "he is so far affected in equity and good conscience, that the law will not permit him to recover again for the same damages." [22] The office of compensatory damages is to make the plaintiff whole, but certainly not more than whole.[23]

■ A common application of this rule is to settlements by less than all of two or more joint tortfeasors. Where the plaintiff settles with one, the rest are granted a credit on the judgment for the amount of the settlement, regardless of whether the settling defendant has any liability to other litigating defendants.[24] There is nothing in logic or precedent which requires limitation

16. "A motion to alter or amend the judgment shall be served *not later than 10 days after* entry of the judgment." Fed.R.Civ.P. 59(e).

17. *Snowden v. D.C. Transit Sys., Inc.*, 147 U.S. App.D.C. 204, 454 F.2d 1047 (1971). There we reversed a determination by the District Court that a motion for a judgment credit was, as Kassman contends, governed by Rule 59(e). We ruled unequivocally that the motion should have been dealt with as a Rule 60(b)(5) motion. *Id.* at 205 n.4, 454 F.2d at 1048 n.4.

18. Fed.R.Civ.P. 60(b).

19. The judgment in this case was entered on October 4, 1974, and the motion for the credit was made on the following November 4.

20. Both sides were instructed by the pretrial order *to* file memoranda *on* that point, and both addressed the issue in their trial briefs.

21. *Snowden v. D.C. Transit Sys., Inc., supra* note 17, 147 U.S.App.D.C. at 205, 454 F.2d at 1048.

22. *Id.,* quoting *Lovejoy v. Murray,* 70 U.S. (3 Wall.) 1, 17, 18 L.Ed. 129, 134 (1865).

23. See *Snowden v. D.C. Transit Sys., Inc., supra* note 17, 147 U.S.App.D.C. at 205, 454 F.2d at 1048; *Hudson v. Lazarus,* 95 U.S.App.D.C. 16, 18, 217 F.2d 344, 346 (1954); *McKenna v. Austin,* 77 U.S.App.D.C. 228, 233, 134 F.2d 659, 664, 148 A.L.R. 1253 (1943).

24. *Rose v. Associated Anesthesiologists,* 163 U.S.App.D.C. 246, 501 F.2d 806 (1974); *Snowden v. D.C. Transit Sys., Inc., supra* note 17; *Brightheart v. McKay,* 136 U.S.App.D.C. 400, 420 F.2d 242 (1969); *Martello v. Hawley,* 112 U.S.App.D.C. 129, 300 F.2d 721 (1962); *McKenna v. Austin, supra* note 23. Where one tortfeasor would be entitled to compel contribution from another but for the plaintiff's settlement with that tortfeasor, the plaintiff's judgment has been further reduced so that the non-settling tortfeasor pays no more than his pro rata share. This means, of course, that the plaintiff *does not receive full compensation for* the injury as found by the jury, but that results from the plaintiff's decision to settle with one of the defendants, thereby depriving other litigating defendants of their right to contribution. See, *e.g., Brightheart v. McKay, supra; Martello v. Hawley, supra.* Full credit for the proceeds of settlement has not been allowed, however, in a situation wherein a windfall to the

of the underlying principle to situations involving joint tortfeasors or to those involving unintentional torts; on the contrary, there is the soundest of reasons to indulge its operation wherever more than one is responsible for a single injury. Where there has been only one injury, the law confers only one recovery, irrespective of the multiplicity of parties whom or theories which the plaintiff pursues.[25]

██ There is, however, a well entrenched exception to the doctrine that the injured party can recover only the amount of his loss—the so-called collateral source rule.[26] Under that rule, "an injured person may usually recover in full from a wrongdoer regardless of anything he may get from a 'collateral source' unconnected with the wrongdoer." [27] The policy behind the rule is that "a benefit which came to the injured party should not be shifted so as to become a windfall to the tortfeasor. If the plaintiff was himself responsible for the benefit as by maintaining his own insurance, or by making advantageous employment arrangements, the law allows him to keep it for himself. If the benefit was a gift to the plaintiff from a third party, or established for him by law, he should not be deprived of the advantage which it confers." [28]

██ Consistently with that policy, we have held that the collateral source rule, does not apply where, although a benefit is received because of the harm, such benefit is the result of the forethought of the plaintiff or of a gift to him by a third person. The plaintiff is not barred from recovery merely because he suffers no net loss from the injury, as where he is insured or where friends make contributions to him because of the loss. If his things are tortiously destroyed, the insurance carrier is subrogated to his position. In other cases the damages which he is entitled to recover are not diminished by the fact that, either as a matter of a contract right or because of gifts, the transaction results in no loss to him. Where a person has been disabled and hence cannot work but derives an income during the period of disability from a contract of insurance or from a contract of employment which requires payment during such period, his income is not the result of earnings but of previous contractual arrangements made for his own benefit, not the tortfeasor's. Likewise, the damages for loss of earnings are not diminished by the fact that his employer or a third person makes gifts to him even though these have been given because of his incapacity. Further, he may be able to recover for the reasonable value of medical treatment or other services made necessary by the injury although these have been donated to him.

---

only defendant whose liability is submitted to the jury would be provided. In *Rose v. Associated Anesthesiologists, supra,* full credit for a settlement payment was disallowed, and the tortfeasor found liable by the jury was required to pay its pro rata share of the judgment, since otherwise the only defendant condemned by the jury would have escaped with less than the share it would have had to pay had all the defendants been found liable. In that circumstance, it was held that the windfall should better fall to the plaintiff than to the defendant. *Rose v. Associated Anesthesiologists, supra,* 163 U.S.App.D.C. at 249–250, 501 F.2d at 809–810. That problem arises only where one defendant settles for an amount which is more than his pro rata share of the judgment would have been if his liability had been established by the jury's verdict.

**25.** Those courts which have considered the question have held either that once there has been a settlement or satisfied judgment in a breach of contract action, there can be no action for interference with the contract, see, *e.g., Swift v. Beaty,* 39 Tenn.App. 292, 282 S.W.2d 655, 659–660 (1954); *Bird v. Randall,* 3 Burr. 1345, 97 Eng.Rep. 866 (1762), or that any recovery in the tort action would be limited to additional damages which were not covered in the contract action, see *McNutt Oil & Ref. Co. v. D'Ascoli,* 79 Ariz. 28, 281 P.2d 966 (1955); *Simon v. Royal Business Funds Corp.,* 34 A.D.2d 758, 310 N.Y.S.2d 409, *aff'd,* 29 N.Y.2d 692, 325 N.Y.S.2d 649, 275 N.E.2d 21 (1970); *Simon v. Noma Elec. Corp.,* 293 N.Y. 171, 56 N.E.2d 537 (1944). See also *American Home Assurance Co. v. Vaughn,* 21 Ariz.App. 190, 517 P.2d 1083, 1085–1086 (1974).

**26.** As explained in the Restatement of Torts § 920 comment (*e*) (1939), the usual rule restricting the injured party to his actual loss

See in *accord* Restatement (Second) of Torts § 920A comment *b* (Tentative Draft No. 19, 1973).

**27.** *Hudson v. Lazarus, supra* note 23, 95 U.S. App.D.C. at 18, 217 F.2d at 346.

**28.** Restatement (Second) of Torts § 920A comment *b* (Tentative Draft No. 19, 1973). See also *Hudson v. Lazarus, supra* note 23, 95 U.S. App.D.C. at 18–19, 217 F.2d at 346–347; *Bryant v. Mathis,* 107 U.S.App.D.C. 339, 340,

which broadly intercepts benefits derived contractually or gratuitously,[29] does not apply to the proceeds of settlements of litigation, even when made by one later found not liable to the recipient. "A settlement made by one liable potentially, but not in fact, is made under Damoclean pressure not gratuitously."[30] We encounter no difficulty in concluding that the $5,000 settlement by American University in the Superior Court action did not come from a collateral source within the contemplation of the exception.

■ The compensation provided Kassman by the Superior Court settlement was an integral part of the damages assessed by the District Court jury. In the Superior Court action, Kassman sought damages against the University for non-renewal of his contract on grounds of breach of contract and for failure to follow prescribed procedures. In the District Court action, as it went to the jury—with the libel claim by then ruled out[31]—the case once again centered on non-renewal of the contract, this time on the question whether Ultan had improperly induced it. The critical circumstances were that one lawsuit from the beginning was, and the other ultimately became, an effort to recover the loss generated by the non-renewal, and that the verdict returned in the District Court fixed that loss at a maximum of $15,000. In other words, there was but one loss—that resulting from nonrenewal of the contract—notwithstanding Kassman's differing theories that the University bore responsibility therefor as a matter of contract-breach and disregard of applicable procedures, while Ultan did so by reason of unjustified interference with Kassman's

contractual relationship with the University. It follows that if the amount paid in settlement reimbursed Kassman for part of the loss established by the verdict, the judgment on that verdict should have been credited with the payment on settlement.

It is clear enough that the settlement payment and the jury's award pertained inseparably to one and the same loss. In his prayer for relief in the Superior Court, Kassman specified as damages his annual salary of $17,000 for the unrenewed year less the salary he earned during the two months he was under special contract with the University.[32] In the District Court, the jury was instructed that should it find Ultan liable, it could award damages to Kassman in the amount of the salary unpaid for the one year left in the contract between the University and Wolftrap[33] plus damages for mental anguish, pain and suffering.[34] It is therefore apparent that the damages sought and settled for $5,000 by Kassman in the Superior Court action were a part of the damages which the jury in the District Court was authorized to allow him. The fact that additional categories of damages were demanded in the District Court is irrelevant since all the damages that Kassman could summon for his Superior Court claim were within the damages the jury was permitted to assess, and did assess at $15,000, in the District Court action. To allow Kassman to retain the $5,000 in addition to the $15,000, which the jury found to be his total damages, would make him more than whole for the injury he suffered.

The judgment appealed from is reversed to the extent that the credit thereon was disallowed, and is affirmed in all other re-

278 F.2d 19, 20 (1960); McCormick, Damages § 90, at 324–325 (1935).

**29.** See note 26 *supra.*

**30.** *Snowden v. D.C. Transit Sys., Inc., supra,* note 17, 147 U.S.App.D.C. at 206, 454 F.2d at 1049.

**31.** See text *supra* at note 4.

**32.** J.App. 30.

**33.** There was initially some confusion in the District Court's instructions concerning what period remained in the contract between the University and Wolftrap. The jury was finally but clearly instructed that, after taking into consideration mitigation efforts on Kassman's part, it could award him damages for loss of income up to 13 months, less any income he earned during that period. J.App. 550–551, 554–556.

**34.** J.App. 550–551, 554–556.

spects. The case is remanded to the District Court with instruction to credit on the judgment the $5,000 paid by American University in settlement of the Superior Court litigation.

*So ordered.*