20 F.3d 1070
 FEDERAL DEPOSIT INSURANCE CORPORATION, receiver for and on
behalf of Heritage Bank and Trust, Plaintiff-Appellee,
v.
UNITED PACIFIC INSURANCE COMPANY, a corporation; Reliance
Insurance Company, a corporation, Defendants-Appellants.
 No. 92-4195.
 United States Court of Appeals,
Tenth Circuit.
 March 29, 1994.
 
 Phillip L. Bruner of Faegre & Benson, Minneapolis, MN (Raymond M. Berry, Robert H. Henderson of Snow, Christensen & Martineau, Salt Lake City, UT with him on the brief), for defendants-appellants.
 Claire L. McGuire, Sr. Counsel, F.D.I.C., Washington, DC (Mark E. Friedman of Garvey, Schubert & Barer, Portland, OR, Ann S. DuRoss, Asst. General Counsel, Colleen B. Bombardier, Counsel, F.D.I.C., Washington, DC with her on the brief), for plaintiff-appellee.
 Before BALDOCK, BRORBY, and EBEL, Circuit Judges.
 BALDOCK, Circuit Judge.
 
 
 1
 The Federal Deposit Insurance Corporation ("FDIC"), as receiver for Heritage Bank and Trust ("Heritage"), filed this action against Defendant United Pacific Insurance Company seeking recovery under two fidelity bonds covering dishonest acts by employees.[1] The aggregate liability under the bonds totaled $1,450,000. A jury trial was commenced on June 10, 1992, and after five days of testimony, the jury returned a unanimous special verdict in favor of the FDIC. The jury found that John R. Starley, while an officer of Heritage, committed a dishonest act, with manifest intent to cause Heritage to sustain a loss and obtain financial benefit for himself or another person, and that the loss resulting from Starley's dishonest act was $3,333,044.
 
 
 2
 The evidence at trial established the following course of events. On November 7, 1977, Heritage, a state chartered banking institution and a member of the Federal Reserve System, opened for business in Salt Lake City, Utah. The major stockholders of Heritage were Starley and Dr. Jay McEntire, Starley's brother-in-law. Starley served as President of Heritage and was also a member of the Board of Directors.
 
 
 3
 In June 1983, Starley negotiated an arrangement whereby Heritage would enter into a large loan transaction with Andover Funding, Ltd. ("Andover"), a South Dakota corporation. Andover purportedly created a tax shelter investment involving twenty-three separate oil and gas drilling limited partnerships (known as the Transpac Partnerships), in which 873 individuals had each invested $15,000 cash and individually signed twenty-year promissory notes in the amount of $60,000 each. Andover proposed to transfer to Heritage the promissory notes, with a face value of $40 million, in exchange for a $4 million loan. The Transpac Partnerships would then purchase certificates of deposit from Heritage in the amount of $4 million, pledging the certificates to Heritage to secure the discounted notes from Andover. Andover would also pay Heritage a fee of $100,000 for entering into the loan.
 
 
 4
 At the same time that Heritage was proposing to enter into the Andover loan, McEntire entered into a proposed stock purchase agreement with John Landon, Thomas Williams, Stuart Felton, and Phillip Rennert--who were all involved in the Andover loan--to sell his controlling block of Heritage stock. Starley negotiated both the Andover loan and the stock purchase agreement for his brother-in-law McEntire, with the stock purchase being dependant upon the consummation of the Andover loan. Also at this time, at the invitation of Starley and McEntire, Landon became a member of Heritage's Board of Directors. Additionally, Starley entered into a ten-year option agreement with Williams and Landon, pursuant to which if the McEntire stock purchase agreement went into effect, Starley could require the new stockholders to purchase his Heritage stock for 1.75 times book value on demand.
 
 
 5
 Starley submitted the proposed Andover loan transaction for regulatory approval. In June 1983, the Commissioner of Financial Institutions for the State of Utah refused to grant approval and instead issued a temporary Cease and Desist Order to stop the loan transaction, deeming the Andover loan an unsafe and unsound banking practice. The Commissioner and Heritage agreed to have the loan reviewed by a Salt Lake City law firm, which issued a draft opinion on June 27, 1983. The draft opinion noted the following three concerns with the Andover loan: (1) given Andover's involvement in the creation of the promissory notes, the loan by Heritage could be deemed to be a loan not to 873 individuals but rather to one borrower, Andover, and thus could violate the limits on extension of credit to one borrower; (2) the promissory notes could be deemed to be without recourse thereby affecting the ability of the investment to operate as tax shelters for the 873 investors, and also affecting the ability of Heritage to collect on the notes at maturity; and (3) the transfer of Heritage stock ownership by McEntire to some of the limited partners in the Transpac group could result in violations by Heritage of the restrictions on loans to insiders or affiliated persons.
 
 
 6
 In July 1983, Starley informed the Commissioner that the Andover loan would not be consummated. In November 1983, Landon, Williams, Felton, and Rennert signed a written document cancelling their June 1983 agreement to purchase McEntire's Heritage stock.
 
 
 7
 In December 1983, Noram Secured Income Trust, N.V. ("Noram"), a Netherlands Antilles company, loaned Starley $515,822.42 to purchase McEntire's Heritage stock. The loan was secured only by the shares of stock that Starley intended to purchase. In exchange, Starley signed a without recourse promissory note. Starley admitted that the loan he received from Noram was high risk and that, as a banker, he wouldn't have made it, nor did he know of any banker who would.
 
 
 8
 In January 1984, Heritage issued 94,340 new shares of stock, which were purchased by John Geanoulis, Landon, and Felton. These new shares represented a control block of stock. At the time of purchase, each of the three subscribers provided an affidavit that he was acquiring the shares for his own use, and that they were not acting in concert.
 
 
 9
 Prior to the stock purchase by Geanoulis, Landon, and Felton, Starley began negotiating a loan transaction with Hartwell International, N.V. ("Hartwell"), a wholly-owned subsidiary of Noram. In February 1984, Starley arranged an agreement with Andover Finance, Ltd. ("Andover Finance")[2] and Hartwell whereby Heritage would loan Hartwell $4,586,257 to be repaid on April 30, 2007. As security for the loan, Hartwell agreed to pledge 1,522 promissory notes, each payable to Andover Finance and assigned to Hartwell. The makers on the notes were individuals throughout the United States, each of whom was an investor in a Transpac partnership. Hartwell, like Andover Funding, Ltd., purportedly created a tax shelter investment. The investor notes were secured by individual certificates of deposit purchased from Heritage, totaling $5,771,611, which also had maturity dates of April 30, 2007. Heritage received a fee of $91,798. Although this loan arrangement was in substance identical to the proposed Andover loan, Starley did not notify the regulators of the loan transaction. The Hartwell loan transaction caused Heritage to be in violation of a 1982 agreement it made with the Federal Reserve to maintain a capital to asset ratio of nine percent.
 
 
 10
 During a routine visit to Heritage in March 1984, the Federal Reserve discovered the Hartwell loan transaction. The Federal Reserve determined that, on its face, the Hartwell loan transaction presented no unusual credit risk. However, the regulators expressed serious concern over the following: (1) the three new shareholders--Geanoulis, Landon, and Felton--appeared connected to companies or persons associated with the Hartwell loan transaction, (2) the three appeared to have acted in concert in the acquisition of Hartwell stock,[3] and (3) the three appeared to have financed Starley's purchase of McEntire's stock.[4]
 
 
 11
 The Federal Reserve conducted a further investigation of the entire matter and concluded that, in apparent violation of federal and state law pertaining to a change in bank control, individuals connected to the "large and unusual" Hartwell loan transaction acquired control of Heritage prior to consummation of the loan. The report also concluded that the "curious characteristics" of the Hartwell loan transaction suggested that fraud and/or violations of federal law may be at issue. Finally, the investigation revealed that Starley acted with "negligence and a disregard for the safety and soundness" of Heritage by handling the loan transaction with a lack of knowledge about the principals involved, the purpose of the transaction, and the validity of the promissory notes. The report indicated that Starley acknowledged he knew very little about the loan transaction and "did not want to know very much because if something was wrong he did not want to be implicated."
 
 
 12
 In April 1987, one of the Andover Finance principals, Thomas Williams, pleaded guilty to securities fraud, tax fraud, and bank fraud in connection with the marketing of the Transpac oil and drilling ventures. Shortly thereafter, the Transpac investors filed class action suits, alleging securities fraud and naming Heritage as a defendant. The investors sought rescission of their investments and promissory notes, and a return of their certificates of deposit. As a result of Williams' guilty plea, on April 17, 1987, the state took control of Heritage, demanded and received Starley's resignation, and appointed an interim president. The interim president sent notice of a potential bond claim to Defendant on April 23. On April 29, Heritage was declared insolvent by the Utah State Department of Financial Institutions, and the FDIC was appointed as receiver. At this time, the FDIC discovered that Hartwell had not been in existence since 1986. First Interstate Bank acquired Heritage's assets and liabilities with the exception of the certificates of deposit and promissory notes of the Transpac partnerships and the Hartwell loan transaction which were retained by the FDIC.
 
 
 13
 Upon taking over Heritage, the FDIC settled a number of claims by investors seeking cancellation of their promissory notes and return of their certificates of deposit. As of the time of trial, the FDIC presented evidence that it settled 745 of the 1,523 investor claims by paying out $658,992 in order to retain the certificates of deposit worth a total of $2,228,295. The FDIC also presented evidence that it expended $316,090 in administrative expenses to settle these claims. The FDIC's net recovery on these certificates was $1,253,213.
 
 
 14
 In April 1990, the FDIC brought an action against John Lowe, and his law firm, who had served as outside legal counsel for Heritage during the period when the questionable loan transaction took place, for negligence and breach of fiduciary duty with respect to the Hartwell loan transaction and the events leading up to the loan transaction. On March 16, 1992, the FDIC settled all claims against Lowe and his firm in exchange for $1,950,000.
 
 
 15
 The FDIC brought suit against Defendant in June 1990. Prior to trial, the district court ruled on various motions in limine. The significant rulings for purposes of this appeal relate to Defendant's challenges to the FDIC's claim for damages. Defendant sought to introduce evidence that the FDIC was a holder in due course of loan collateral in the form of the investors' promissory notes and certificates of deposit, and thus had suffered no loss as a result of the Hartwell loan transaction. Defendant also challenged the FDIC's method of accounting for the loss that the FDIC claimed it suffered. Finally, the FDIC sought to exclude from evidence the settlement agreement with Lowe.
 
 
 16
 The district court entered an order on January 15, 1992 addressing the various motions in limine. The court ruled all evidence relating to whether the FDIC was in fact a holder in due course of the investors' promissory notes and certificates of deposit inadmissable as irrelevant. The court also denied the Defendant's motion in limine regarding the FDIC's method of accounting. On June 9, 1992, the court ruled that the collateral source rule prohibited the admission of any evidence relating to the settlement agreement between the FDIC and Lowe.
 
 
 17
 Trial commenced on June 10, 1992. The FDIC called Todd Menenberg, a certified public accountant, to testify as to the loss suffered by the FDIC on the Hartwell loan transaction. Menenberg defined the FDIC's loss in accordance with Financial Accounting Standards Board Principle Number ("FASB") 5, which requires a loan to be written off as zero value when it is deemed uncollectible. Menenberg also testified that the certificates of deposit represented liabilities, not assets of the FDIC. From the Hartwell principal loan amount of $4,586,257, Menenberg subtracted the net recovery by the FDIC from the investors ($1,253,213) to reach a total loss figure of $3,333,044.
 
 
 18
 Paul Randle, a professor of finance, testified for Defendant. Randle testified that the loan to Hartwell did not result in a loss because no payment on the loan was due until April 30, 2007. Randle also testified that Heritage was at all times protected by the promissory notes and certificates of deposit as collateral pledged to secure the Hartwell loan transaction.
 
 
 19
 At the close of all evidence, Defendant moved for directed verdict on the ground that the FDIC's claim of loss was "based on speculation and conjecture or a legal conclusion." The court denied the motion, and the case was submitted to the jury. The jury returned a special verdict in favor of the FDIC, finding that the FDIC suffered a $3,333,044 loss as a result of Starley's dishonest act. Consistent with the terms of the bonds, the court entered judgment in favor of the FDIC in the amount of $1,450,000 plus interest. The court then denied Defendant's motion for JNOV and motion for a new trial. This appeal followed.
 
 
 20
 On appeal, Defendant presents the following two claims regarding liability: (1) as a matter of law the FDIC failed to prove the Hartwell loan transaction loss came within the coverage of the bonds, and (2) the jury was erroneously instructed on the issue of manifest intent. As to the issue of damages, Defendant claims the FDIC, as a matter of law, sustained no actual loss for which the bonds provide coverage. Defendant claims the district court erred, as a matter of law, in allowing the jury to find that the FDIC sustained a loss covered by the bonds, based on a method of accounting which: (1) excluded the FDIC's recovery of the $1.2 million net cash surplus of the Hartwell loan transaction, the $500,000 invested by new shareholders, and the $91,000 loan fee; (2) excluded evidence that the FDIC was a holder in due course of the unliquidated Hartwell collateral consisting of promissory notes and certificates of deposit; (3) included the FDIC's claim of administrative expenses of $316,090 which was not supported by the evidence; and (4) excluded evidence of the settlement with attorney Lowe.I.
 
 
 21
 We first note that suits brought by the FDIC are governed by federal law. 12 U.S.C. Sec. 1819; see FDIC v. Kansas Bankers Sur. Co., 963 F.2d 289, 293 (10th Cir.1992). In the absence of applicable federal law, however, we have the option of looking to state law. Kansas Bankers Sur. Co., 963 F.2d at 294. In any event, we act as federal court making federal law. FDIC v. Bank of San Francisco, 817 F.2d 1395, 1398 (9th Cir.1987) (citing D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942) (Jackson, J., concurring)).
 
 A.
 
 22
 Defendant claims the FDIC, as a matter of law, failed to prove the Hartwell loan transaction loss came within the coverage of the bonds. Defendant claims the evidence failed to establish that Starley committed a dishonest or fraudulent act with manifest intent to cause Heritage to sustain a loss and to obtain financial benefit for himself or another. We conclude Defendant has failed to properly preserve this claim.
 
 
 23
 "Only those questions which have been raised in a prior motion for directed verdict may be pursued in a motion for JNOV." Aguinaga v. United Food & Commercial Workers Int'l, 993 F.2d 1463, 1470 (10th Cir.1993). Although we liberally construe motions for directed verdict, the motion must put the trial court on notice of the movant's position to be considered properly raised. Id. Likewise, failure to move for directed verdict bars our review of the sufficiency of the evidence. Koch v. City of Hutchinson, 814 F.2d 1489, 1496 (10th Cir.1987), reh'g in part, on other grounds, 847 F.2d 1436 (1988), cert. denied, 488 U.S. 909, 109 S.Ct. 262, 102 L.Ed.2d 250 (1988).
 
 
 24
 In support of its claim, Defendant cites failures and errors on the part of the FDIC in proving bond coverage. Defendant fails, however, to articulate how the district court erred, "as a matter of law," in allowing the jury to return a verdict in favor of the FDIC on this issue. Because we only review for alleged district court errors, we construe Defendant's claim as an assertion that either the district court erred in failing to grant its Fed.R.Civ.P. 50(a) motion for directed verdict or its Rule 50(b) motion for JNOV, or an assertion that the evidence was insufficient to support the jury's verdict.[5] Although Defendant moved for directed verdict on the ground that the calculation of the FDIC's loss was inappropriate, Defendant failed to move for directed verdict on the bond coverage ground asserted here. Defendant's failure to move for a directed verdict on this issue bars us from considering whether the district court erred in denying the motion for JNOV. Trujillo v. Goodman, 825 F.2d 1453, 1455 (10th Cir.1987); see also Whalen v. Unit Rig, Inc., 974 F.2d 1248, 1251 (10th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1417, 122 L.Ed.2d 787 (1993). Likewise, Defendant's failure to raise the bond coverage issue in its directed verdict motion precludes us from reviewing the sufficiency of the evidence to support the jury's bond coverage finding. Thus, because Defendant has not preserved the issue of whether the FDIC, as a matter of law, failed to prove the Hartwell loan transaction loss came within the coverage of the bond, we will not consider the issue on appeal. See Whalen, 974 F.2d at 1251.[6]B.
 
 
 25
 Defendant also claims the jury was erroneously instructed on the issue of manifest intent. Defendant claims the court erroneously failed to instruct the jury regarding "the requirement of purposeful deleterious conduct," and the court failed to instruct the jury on "the limits of inference which evidence of [Starley's] conduct would permit."
 
 
 26
 In reviewing a challenge to a jury instruction, we consider the instructions in their entirety. Brown v. Wal-Mart Stores, Inc., 11 F.3d 1559, 1564 (10th Cir.1993). We determine whether the instructions stated the governing law and provided the jury with an ample explanation of the issues and applicable standards. Id. We consider "all that the jury heard and, from the standpoint of the jury, decide not whether the charge was faultless in every particular but whether the jury was misled in any way and whether it had an understanding of the issues and its duty to determine those issues." Id. We will reverse only if the error is determined to have been prejudicial, based upon a review of the record as a whole. Id.
 
 
 27
 The fidelity bonds at issue here provide coverage for:
 
 
 28
 (A) Loss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others.
 
 
 29
 Such dishonest or fraudulent acts must be committed by the Employee with the manifest intent
 
 
 30
 (a) to cause the Insured to sustain such loss; and
 
 
 31
 (b) to obtain financial benefit for the Employee or another person or entity.
 
 
 32
 (emphasis added).[7] The bonds do not define "manifest intent."
 
 
 33
 The court gave the jury the following six instructions pertaining to manifest intent:
 
 Instruction 34:
 
 34
 The concept of "manifest intent" does not require that the employee wish for or desire a particular result, but it does require that the result be substantially certain to happen.
 
 Instruction 35:
 
 35
 "Manifest intent" means apparent or obvious intent. "Manifest intent" does not necessarily require that the employee actively wish[es] for or desire[s] a particular result. "Manifest intent" within the meaning of fidelity bond covering losses sustained as a result of fraudulent or dishonest acts of [an] employee[ ] who exhibit[s] manifest intent to cause loss and to obtain benefit for himself or others, means intent which is plainly or palpably evident or certain, apparent or obvious. The possibility that the loan officer used poor judgment in making loans did not establish a "manifest intent" to cause loss.
 
 Instruction 36:
 
 36
 Intent ordinarily may not be proved directly, because there is no way of fathoming or scrutinizing the operations of the human mind. But you may infer a person's intent from the surrounding circumstances. You may consider any statement made and done or omitted by a person, and all other facts and circumstances in evidence which indicate his state of mind.
 
 
 37
 You may consider it reasonable to draw the inference and find that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted. As I have said, it is entirely up to you to decide what facts to find from the evidence.
 
 Instruction 37:
 
 38
 Intent and motive should not be confused. Motive is what prompts a person to act, or fail to act. Intent refers only to the state of mind with which the act is done or omitted. Good motive is never a defense where the act done or omitted is dishonest or fraudulent. So, the motive of John Starley is immaterial except insofar as evidence of motive may aid in the determination of intent. There was an intent to cause the bank to sustain a loss if the natural result of John Starley's conduct would be to injure the Bank even though it may not have been his motive.
 
 Instruction 38:
 
 39
 If a person lacks knowledge that a statement is false only because he closes his eyes to the truth, or otherwise displays a reckless disregard for the truth, you may reasonably infer that person acted with manifest intent. In other words, you may infer a wilful intent based upon a person's reckless indifference to the truth.
 
 
 40
 Recklessly means wantonly, with indifference to consequences. If a person makes a representation without knowing whether it is true or not, or makes it without regard to the truth or falsity or to its possible consequences, he may be found to have made the representation recklessly.
 
 
 41
 "Manifest intent" is a term that has been widely used in the fidelity insurance industry since 1976, see Heller Int'l Corp. v. Sharp, 974 F.2d 850, 857 (7th Cir.1992), and we, along with several other courts, have had the opportunity to define the term. In First Federal Sav. & Loan v. Transamerica Ins., 935 F.2d 1164, 1166 n. 3 (10th Cir.1991), we determined that manifest intent means intent that is "apparent or obvious." Accord Heller, 974 F.2d at 859 (quoting FDIC v. St. Paul Fire & Marine Ins. Co., 942 F.2d 1032, 1035 (6th Cir.1991)). Manifest intent does not require that the employee actively wish for or desire a particular result; rather, manifest intent exists when a particular result is substantially certain to follow from the employee's conduct. Heller, 974 F.2d at 859 (quoting St. Paul Fire and Marine Ins. Co., 942 F.2d at 1035). Manifest intent to cause a loss may be inferred from an employee's reckless conduct and other circumstantial evidence. First Nat'l Bank of Louisville v. Lustig, 961 F.2d 1162, 1166 (5th Cir.1992). Direct evidence of the employee's intent is not required, and a claim by an employee that he intended no loss to the bank is not conclusive. Id.
 
 
 42
 We conclude the district court committed no reversible error in instructing the jury. Contrary to Defendant's assertion, the statement in Instructions 34 and 35 that the concept of manifest intent does not require that "the employee actively wish for or desire a particular result" is an accurate description of the applicable legal standard. See Heller, 974 F.2d at 859. Furthermore, Instruction 34 accurately stated that manifest intent "require[s] that the result be substantially certain to happen."
 
 
 43
 Likewise, because we view the instructions as a whole, see Brown, 11 F.3d at 1564, we find no error in Instructions 36 and 37. Both instructions correctly explained that the jury was permitted to infer intent from results which were the "natural and probable consequences of acts knowingly done." See Heller, 974 F.2d at 859 (citation omitted). Furthermore, when read with Instructions 34 and 35, the jury was correctly instructed that, although it could infer intent, to satisfy the requirement of manifest intent, it was required to find that Starley's intent to cause a loss and benefit himself "was plainly or palpably evident or certain, apparent or obvious." Given Instructions 34 and 35, the explanations of general intent contained in Instructions 36 and 37 did not impermissibly weaken the requirement of manifest intent.
 
 
 44
 Finally, Instruction 38 did not misstate the law by instructing the jury that it could infer manifest intent from "reckless disregard for the truth." As stated above, evidence of reckless conduct can support an inference of manifest intent. See First Nat'l Bank of Louisville, 961 F.2d at 1166. We therefore conclude that, when viewed in their entirety, the instructions provided the jury with an adequate "understanding of the issues and its duty to determine those issues." See Brown, 11 F.3d at 1564.
 
 II.
 
 45
 Defendant claims the FDIC, as a matter of law, sustained no actual loss for which the bonds provide coverage.[8] Defendant claims the district court erred, as a matter of law, in allowing the jury to find that the FDIC sustained a loss covered by the bonds, based on a method of accounting which: (1) excluded the FDIC's recovery of the $1.2 million net cash surplus of the Hartwell loan transaction, the $500,000 invested by new shareholders, and the $91,000 loan fee; (2) excluded evidence that the FDIC was a holder in due course of the unliquidated Hartwell collateral consisting of promissory notes and certificates of deposit; (3) included the FDIC's claim of administrative expenses of $316,090 which was not supported by the evidence; and (4) excluded evidence of the settlement with attorney Lowe.
 
 A.
 
 46
 Defendant claims the court erred in allowing the jury to find that the FDIC suffered an actual loss in connection with the Hartwell loan transaction. According to Defendant, the FDIC failed to establish a loss because the Hartwell loan was fully collateralized. Under the FDIC's theory of the case, the FDIC suffered a loss of $4,586,257--the amount loaned to Hartwell, because no payment was ever made on the loan, and Hartwell no longer exists, making the loan uncollectible. To this amount, the FDIC applied $1,253,213 which represented actual net recoveries it had obtained from settlements with some of the named investors on certificates of deposit the FDIC held as collateral for the Hartwell loan transaction. The FDIC did not credit against this loss, the value of the promissory notes or unsettled certificates of deposit it continues to retain. Defendant claims this computation of loss, under principles of receivership accounting, evidenced a mere theoretical or bookkeeping loss, which is not recoverable under the bonds. Defendant claims the FDIC sustained no actual loss because although Heritage loaned Hartwell $4,586,257, it received collateral in the form of promissory notes and certificates of deposit worth $5.8 million. Because Heritage actually received $1.2 million more than it loaned out, Defendant argues, and because the FDIC continues to have rights to this collateral, no actual loss occurred.
 
 
 47
 We consider motions for directed verdict and motions for JNOV under the same standard. Zimmerman v. First Fed. Sav. & Loan Ass'n, 848 F.2d 1047, 1051 (10th Cir.1988). Under this standard, "we may find error in the denial of such a motion only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion; we must construe the evidence and inferences most favorably to the nonmoving party." Ralston Dev. Corp. v. United States, 937 F.2d 510, 512 (10th Cir.1991) (citation omitted). We review the district court's denial of directed verdict and JNOV motions de novo. First Sec. Bank v. Taylor, 964 F.2d 1053, 1055 (10th Cir.1992). We review the district court's denial of a motion for new trial for abuse of discretion. Aguinaga v. United Food & Commercial Workers Int'l, 993 F.2d 1463, 1469 (10th Cir.1993).
 
 
 48
 We begin our analysis with the language of the bonds. In interpreting fidelity bonds, we follow the liberal rules applicable to insurance contracts, rather than the strict rules of suretyship. United Bank & Trust Co. v. Kansas Bankers Sur. Co., 901 F.2d 1520, 1522 (10th Cir.1990); see also Home Sav. & Loan v. Aetna Casualty & Sur. Co., 817 P.2d 341, 346-47 (Utah App.1991). In the absence of ambiguity, the language of the bond is the only legitimate evidence of the parties' intent. United Bank & Trust Co., 901 F.2d at 1522.
 
 
 49
 The bonds at issue in the instant case state that the insurer agrees to indemnify the insured for "loss resulting directly from dishonest or fraudulent acts committed by an [e]mployee." (emphasis added). The bonds do not define loss. The bonds also provide that:Recoveries, whether effected by the [insurer] or by the [i]nsured, shall be applied net of the expense of such recovery first to the satisfaction of the [i]nsured's loss which would otherwise have been paid but for the fact that it is in excess of [bonds' limits of liability]. Secondly, to the [insurer] as reimbursement of amounts paid in settlement of the [[i]nsured's claim...."
 
 
 50
 (emphasis added). Thus, under the language of the bonds, Defendant must indemnify the FDIC up to the limits of the bonds, for "losses directly resulting from" Starley's dishonest acts less net "recoveries," if any, over and above the FDIC's uncovered losses. We must now determine whether the FDIC sustained a recoverable loss under the bond.
 
 
 51
 A fidelity insurance contract indemnifies against loss, and the insured has the burden of proving that it suffered an actual loss by a preponderance of the evidence. Leader Clothing Co. v. Fidelity & Casualty Co. of New York, 237 F.2d 7, 9 (10th Cir.1956); Continental Casualty Co. v. First Nat. Bank, 116 F.2d 885, 887 (5th Cir.), cert. denied, 313 U.S. 575, 61 S.Ct. 1087, 85 L.Ed. 1533 (1941). Language in a fidelity bond to the effect that the insured is covered for "losses directly resulting from...." indicates a direct loss or the actual depletion of bank funds caused by the employee's dishonest acts. First American State Bank v. Continental Ins. Co., 897 F.2d 319, 325 (8th Cir.1990); American Trust & Sav. Bank v. United States Fidelity & Guaranty Co., 418 N.W.2d 853, 855 (Iowa 1988). "[L]ack of any pecuniary loss by the insured from the alleged wrongful acts constitutes a good defense, since in such case no recovery can be had." 13 Couch on Insurance 2d Sec. 46:219 (1982). Bookkeeping or theoretical losses, not accompanied by actual withdrawals of cash or other such pecuniary loss is not recoverable. See Everhart v. Drake Management, Inc., 627 F.2d 686, 691 (5th Cir.1980); Fidelity & Deposit Co. of Maryland v. USAform Hail Pool, Inc., 463 F.2d 4, 6-7 (5th Cir.1972).
 
 
 52
 In terms of loss with respect to the making of loans, a bank suffers a loss when funds are disbursed due to the employee's wrongful conduct. Portland Fed. Employees Credit Union v. Cumis Ins. Soc'y, Inc., 894 F.2d 1101, 1105 (9th Cir.1990). The measure of damage of the actual loss regarding a loan is the outstanding balance due on the loan. Puget Sound Nat. Bank v. St. Paul Fire & Marine Ins. Co., 32 Wash.App. 32, 645 P.2d 1122, 1129 (1982). Furthermore, in Fitchburg Sav. Bank v. Massachusetts Bonding & Ins. Co., 274 Mass. 135, 174 N.E. 324, 328 (1931), the Massachusetts Supreme Court stated:
 
 
 53
 Loss means the deprivation or dispossession of money or property of the bank due to the dishonest, criminal, or fraudulent acts of its officers, regardless of the security the bank has for the loss, and that the "loss" occurred and was suffered by the plaintiff, without regard to its possible remedies, when its funds in fact were diverted....
 
 
 54
 (emphasis added); see also United Bank & Trust Co., 901 F.2d at 1523; Citizens Bank of Oregon v. American Insurance Co., 289 F.Supp. 211, 213-14 (D.Or.1968); American Trust & Sav. Bank, 418 N.W.2d at 855. Accord 13 Couch on Insurance 2d Sec. 46:221 (1982) (in determining loss we are concerned only with the immediate and direct effect of the employee's actions; it is not material that insured may be able to obtain reimbursement or recover its loss).
 
 
 55
 We conclude the district court did not err in refusing to direct a verdict, grant Defendant's motion for JNOV, or grant Defendant's motion for new trial. The FDIC's evidence demonstrated that it suffered more than a bookkeeping or theoretical loss. A bookkeeping loss involves only entries on the books, without any accompanying disbursement of funds. See In re Schluter, Green & Co., 93 F.2d 810, 812 (4th Cir.1938) (insured company suffered no loss because employee deposited money derived from dishonest conduct in company's bank account). In the Hartwell loan transaction, Starley's dishonest conduct caused Heritage to actually disburse $4.5 million to Hartwell. Because the $4.5 million will never be collected from Hartwell, this amount is the starting point in determining the FDIC's loss on the loan. That the loan was secured by collateral in the form of promissory notes and certificates of deposit does not mean the FDIC suffered no actual loss, because the notes and certificates of deposit remain the subject of a suit by the investors. Furthermore, whether a loss occurred is determined "regardless of the security the bank has for the loss." Fitchburg, 174 N.E. at 328; 13 Couch on Insurance 2d Sec. 46:221 (1982). The value of the collateral does not define the loss; rather, if the collateral is finally determined in favor of the insured, under the terms of the bond, it becomes a "recovery" applicable against the loss. See, e.g., United States Fidelity & Guar. Co. v. Empire State Bank, 448 F.2d 360, 366-67 (8th Cir.1971) (insured's total loan loss increased by amount of depreciation of stock given as collateral for the loan, even though stock fully collateralized loan when made); see also 15A Couch on Insurance 2d Sec. 57:50 (1983) (insurer is entitled to have deducted an amount already collected from defaulting employee or third person). The certificates of deposit and promissory notes that remain the subject of separate litigation have not yet been finally determined in favor of the FDIC; therefore, until such time as they are, or until the FDIC enters into settlements with the remaining investors, the value of the certificates does not reduce the FDIC's loss.
 
 
 56
 Defendant presented evidence that the FDIC sustained no loss because the Hartwell loan was fully collateralized. The jury, however, gave weight to the FDIC's evidence concerning loss. Because the amount of the loss is a question for the jury, see 15A Couch on Insurance Sec. 57:53 (1983), and because the evidence is susceptible to reasonable inferences supporting the FDIC's position, the district court did not err in refusing to direct a verdict, grant a motion for JNOV in favor of Defendant, or grant Defendant a new trial.[9]
 
 B.
 
 57
 Defendant claims the district court erroneously excluded evidence that the FDIC was a holder in due course of the unliquidated Hartwell collateral consisting of promissory notes and certificates of deposit. Defendant argues that because the FDIC was a holder in due course of the notes and certificates, it was thereby entitled to retain the collateral against any defense by the investors except fraud in the factum. In granting the FDIC's motion in limine, the district court determined that the holder in due course issue was irrelevant. We review the district court's decision to exclude evidence for abuse of discretion. Durtsche v. American Colloid Co., 958 F.2d 1007, 1011 (10th Cir.1992).
 
 
 58
 The district court did not abuse its discretion in excluding evidence that the FDIC was a holder in due course of the notes and certificates of deposit. Regardless of whether the FDIC will ultimately be determined to be a holder in due course of the notes and certificates, at the time of trial no such determination had been made. Furthermore, the instant case was not the proper forum for such a determination. The investors are not parties in this case; as a result, a determination of whether or not they are entitled to the cancellation of the promissory notes and return of the certificates of deposit, as against an FDIC defense that it is a holder in due course, would be inappropriate. See Smith v. Federal Sur. Co., 60 S.D. 100, 243 N.W. 664, 667 (1932) ("The liability of these makers may not be finally determined in a suit in which the makers are not parties"). In any event, regardless of the fact that the FDIC may ultimately be held to be a holder in due course of the notes and certificates, "the ultimate collectibility of the notes [and certificates] [does] not absolve [Defendant] from its present liability under its bond." See id. This is so because Defendant is liable until the notes and certificates are finally determined in favor of the FDIC, or until the FDIC enters into settlements with the remaining investors. See supra part II.A.
 
 C.
 
 59
 Defendant next asserts the FDIC's claim that it incurred administrative expenses of $316,090 in settling investors' claims was not supported by the evidence. "When a jury verdict is challenged on appeal, our review is limited to determining whether the record--viewed in the light most favorable to the prevailing party--contains substantial evidence to support the jury's decision." Comcoa, Inc. v. NEC Tel., Inc., 931 F.2d 655, 663 (10th Cir.1991) (citation omitted).
 
 
 60
 Defendant first claims that the FDIC is not entitled to recover administrative expenses incurred in settling claims with the investors because the settlements with the investors were not recoveries. We disagree. As we stated supra part II.A, the amounts of these settlements were recoveries; thus, under the terms of the bonds, the FDIC is entitled to deduct the cost of obtaining such recoveries from the amount of the recoveries that apply against the FDIC's loss.
 
 
 61
 Defendant next argues that, even if administrative expenses were recoverable, the FDIC offered no evidence in support of the amount of $316,090 in expenses. At trial, the FDIC's expert witness, Accountant Menenberg, testified that the expenses in settling the investors' claims, based on the FDIC's internal records and recent historical data, averaged 9.5 cents for every dollar recovered. In addition to these expenses, Menenberg added the costs associated with determining the actual ownership of the certificates of deposit. Menenberg testified that his calculations were based on the terms of the bond itself, his experience as an accountant, and generally accepted accounting principles concerning the calculation of damages under fidelity bonds. Defendant presented no evidence to refute Menenberg's calculations. Viewed in the light most favorable to the FDIC, we conclude this evidence of administrative expenses was sufficient to support the jury's decision.
 
 D.
 
 62
 Finally, Defendant claims the district court erred in excluding evidence of the FDIC's $1,950,000 settlement with Attorney Lowe and his firm. The district court excluded the evidence on the basis of the collateral source rule. We review for abuse of discretion. Durtsche, 958 F.2d at 1011.[10]
 
 
 63
 "It is a fundamental legal principle that an injured party is ordinarily entitled to only one satisfaction for each injury." U.S. Indus., Inc. v. Touche Ross & Co., 854 F.2d 1223, 1236 (10th Cir.1988). "When a plaintiff receives an amount from a settling defendant, therefore, it is normally applied as a credit against the amount recovered by the plaintiff from a non-settling defendant, provided both the settlement and the judgment represent common damages." Id. This rule applies where the defendants' conduct results in a single injury. Id.
 
 
 64
 The record, as it is developed thus far, indicates that the settlement with Lowe and the suit against Defendant relate to a single injury--i.e., the loss on the Hartwell loan. Consequently, under the terms of the bonds, the Lowe settlement proceeds should be applied to reduce the jury verdict with respect to the FDIC's sustained losses, unless the collateral source rule dictates otherwise.
 
 
 65
 The collateral source rule provides that "a wrongdoer is not entitled to have damages, for which he is liable, reduced by proof that the plaintiff has received or will receive compensation or indemnity for the loss from an independent collateral source." DuBois v. Nye, 584 P.2d 823, 825 (Utah 1978). The policy behind the rule is that a benefit that comes to the plaintiff should not be shifted so as to become a windfall to the wrongdoer. Kassman v. American University, 546 F.2d 1029, 1034 (D.C.Cir.1976). If the plaintiff is responsible for the benefit--e.g., because he maintained his own insurance, or if the benefit was a gift to the plaintiff, he should not be deprived of the benefit. Id. A settlement of litigation, however, does not fall within the rationale behind either of these examples. See id. Consequently, the collateral source rule ordinarily does not apply to settlement proceeds. Id. at 1034-35; see also School District No. 11 v. Sverdrup & Parcel and Assocs., 797 F.2d 651, 655-56 (8th Cir.1986).
 
 
 66
 We conclude the district court erred in applying the collateral source rule to exclude evidence of the Lowe settlement.[11] The FDIC has cited us no authority for applying the collateral source rule to prevent an insurer under a fidelity bond from receiving credit for a settlement with a separate party, and we see no reason to extend the doctrine to this scenario. We believe the better approach is that taken by the Fifth Circuit in FDIC v. Mmahat, 907 F.2d 546, 550 (5th Cir.1990), cert. denied, 499 U.S. 936, 111 S.Ct. 1387, 113 L.Ed.2d 444 (1991). In FDIC v. Mmahat, the court held that, to avoid double recovery, the FDIC's judgment against an attorney liable for malpractice should be reduced by the amounts paid by the settling officers and directors. See id. ("Because the money paid by the settling defendants and recovery from Mmahat overlap, we feel Mmahat should get credit for the amount paid"). Moreover, we believe this approach is consistent with Utah law which, to date, has only applied the collateral source rule to prevent proceeds from an insurance policy procured by the plaintiff from reducing a tortfeasor's damages. See, e.g., DuBois, 584 P.2d 823; Suniland Corp. v. Radcliffe, 576 P.2d 847 (Utah 1978); Phillips v. Bennett, 439 P.2d 457 (Utah 1968). Finally, under the terms of the bonds themselves, Defendant is entitled to credit for "net recoveries" obtained by the FDIC on the loss. For these reasons, we conclude Defendant may be entitled to a reduction of the judgment against it, if, as the record thus far indicates, the Lowe settlement and the judgment against Defendant represent common damages. To hold otherwise would permit the FDIC to obtain a double recovery. We therefore remand for the district court to determine what portion of the $1,950,000 settlement with Lowe represents common damages and thus must be credited against the judgment.[12]
 
 
 67
 In conclusion, we AFFIRM the district court on the issues concerning liability. As to damages, we AFFIRM on all issues except as to exclusion of the evidence of the settlement with Lowe. On this issue, we REVERSE and REMAND for further proceedings consistent with this opinion.
 
 
 
 [1]
 Reliance Insurance Company, an affiliate of United Pacific, is also a named defendant. The parties stipulated in the pre-trial order, however, that United Pacific issued the bonds in question
 
 
 [2]
 The record is unclear as to the relationship, if any, between Andover Finance, Ltd. and Andover Funding, Ltd. Whether any such relationship exists, however, has no bearing on our decision
 
 
 [3]
 Geanoulis was a director of Hartwell until he resigned on February 28, 1984. Landon and Felton were represented by attorney Terrell Smith, who had a deposit account at Heritage which was used to effect payment for the stock purchased by all three individuals. Most of the deposits to Smith's account were in the form of checks drawn on an account in a Connecticut bank in the name of Noram. Geanoulis was a director of Noram. Smith's law office was next door to the office of Transpac
 
 
 [4]
 Starley used funds drawn on the "Terrell W. Smith Trust Account" to purchase McEntire's stock. Funds in the Smith account came from two checks drawn on a Noram account and signed by Geanoulis
 
 
 [5]
 We do not construe Defendant's claim as raising an issue regarding the district court's denial of its motion for new trial because Defendant did not seek a new trial on the ground that the FDIC failed to prove the elements of bond coverage
 
 
 [6]
 If we did reach the merits of Defendant's bond coverage issue, we would conclude that the record indicates ample evidence to support the issue going to the jury, and ample evidence from which the jury could conclude that Starley committed a dishonest or fraudulent act with manifest intent to cause Heritage to sustain a loss and to obtain financial benefit for himself or another. Despite Starley's protestations to the contrary, the evidence at trial was such that the jury could reasonably conclude Starley acted with manifest intent to cause Heritage a loss and benefit himself by, inter alia: (1) negotiating a lucrative option agreement, dependant upon the approval of the Andover loan transaction, whereby the prospective buyers agreed to purchase Starley's shares for 1.75 times book value if he so demanded, (2) entering into the Hartwell loan transaction, despite warnings concerning the nearly identical Andover loan transaction, without informing regulatory officials, (3) negotiating the Hartwell loan transaction while at the same time accepting the benefit of a loan with highly favorable terms from the company that owned Hartwell, (4) playing a role in the sale of a controlling block of Heritage stock to Geanoulis, Landon, and Felton, who were all connected to the Hartwell loan transaction, and (5) willfully blinding himself to any wrongdoing associated with the Hartwell loan transaction in order to save himself from implication
 
 
 [7]
 The bonds also provide that when the loss results from a loan, as was the case here, the loss is not covered by the bonds unless the employee also "was in collusion with one or more parties to the transactions and has received, in connection therewith, a financial benefit with a value of at least $2,500."
 
 
 [8]
 Again, Defendant fails to articulate how the district court erred as a "matter of law" in disposing of this claim. In its brief, Defendant asserts that the district court erred "in allowing the jury to find...." We construe this language as a claim that the district court erred in failing to grant Defendant's Fed.R.Civ.P. 50(a) motion for directed verdict, its Rule 50(b) motion for JNOV, or its motion for new trial
 
 
 [9]
 The jury also was permitted to find that the $1.2 million "net cash surplus," the $500,000 invested by new shareholders, and the $91,000 loan fee did not reduce the FDIC's loss. With respect to the $1.2 million, we first point out that this amount is not to be confused with the $1,253,213 representing the FDIC's net recoveries from settling investors. The $1,253,213 in net recoveries was actually credited by the jury in reaching its judgment of $3,333,044. The $1.2 million "net cash surplus" referred to by Defendant is the amount Heritage allegedly received from Hartwell, upon consummation of the loan transaction, over and above the amount Heritage loaned to Hartwell. This so-called "net cash surplus" of $1.2 million, however, was merely security for the Hartwell loan in the form of certificates of deposit which remain the subject of litigation. As a result, the above reasoning concerning unliquidated collateral for the Hartwell loan applies with equal force to this sum
 In addition, the evidence was such that the jury could find the $500,000 invested by new shareholders in the 94,340 new shares of Heritage stock and the loan fee of $90,000 did not reduce the FDIC's loss. In both instances, Heritage gave something of value or potential value in exchange for the sums received. Therefore, the FDIC is not required to count these sums again by applying them towards the Hartwell loan loss.
 
 
 [10]
 Defendant also claims, for the first time on appeal, that the FDIC's agreement with Lowe impaired Defendant's subrogation rights against Lowe and therefore releases Defendant from all liability. Because this argument was not properly raised below, we will not consider it on appeal. See O'Connor v. City of Denver, 894 F.2d 1210, 1214 (10th Cir.1990)
 Furthermore, to the extent Defendant argues that it was deprived of the opportunity to present evidence that Lowe, not Starley, was the cause of the FDIC's loss, we disagree. In granting the FDIC's motion in limine, the district court only excluded evidence of the settlement with Lowe. Defendant was not prevented from introducing evidence of wrongdoing on the part of Lowe, and, in fact, exhibits concerning Lowe's involvement with the Hartwell loan transaction were received into evidence.
 
 
 [11]
 We note that the usual method of obtaining a reduction in a judgment due to a settlement with another party is via a post-judgment motion for credit on the judgment. See Fed.R.Civ.P. 60(b); see also Touche Ross & Co., 854 F.2d at 1235; Kassman, 546 F.2d at 1033
 
 
 [12]
 We note that because the jury concluded that the FDIC sustained a loss greater than the limits of the bonds, the applicable portion of the Lowe settlement proceeds must first reduce the FDIC's total loss before the proceeds are applied to reduce the judgment against Defendant