**FIRST NATIONAL BANK OF LOUIS-VILLE, Plaintiff–Appellee, Cross–Appellant,**

v.

**Loretta LUSTIG, et al., Defendants,**

**Aetna Casualty and Surety Co., and Federal Insurance Co., Defendants–Appellants, Cross–Appellees.**

No. 94–30619.

United States Court of Appeals, Fifth Circuit.

Sept. 30, 1996.

**1558**

Matt J. Farley, Barbara Malik Weller, Deutsch, Kerrigan & Stiles, New Orleans, LA, Thomas G. Hungar, Larry L. Simms, Rebecca Anne Womeldorf, John J. Swenson, Gibson, Dunn & Crutcher, Washington, DC, for defendants-appellants.

John M. Newman, Jr., Richard I. Weder, Jr., Jeffrey S. Sutton, Jones, Day, Reavis & Pogue, Cleveland, OH, Barry W. Ashe, Stone, Pigman, New Orleans, LA, Patrick M. Ardis, Mary L. Wolff, Douglas A. Black, Wolff & Ardis, Memphis, TN, William S. Boyd, III, Gulfport, MS, William E. Brown, Covington, LA, for plaintiff-appellee.

Before BARKSDALE, DeMOSS and PARKER, Circuit Judges.

DeMOSS, Circuit Judge:

We are again faced with questions surrounding the First National Bank of Louisville's suit against Aetna Casualty and Surety Company and Federal Insurance Company (the "Sureties") to recover under a Banker's Blanket Bond for damages arising out of the dishonest or fraudulent activities of a former bank loan officer. On our first visit, we (1) reversed the district court's summary judgment order because we found that genuine issues of material fact existed as to whether the bank officer intended to injure the bank and benefit himself so as to trigger liability for the Sureties under the bond coverage provisions; and (2) held that the district court erred in using a restrictive definition of dishonest or fraudulent conduct when instructing the jury on the Sureties' termination of coverage defense. *First Nat. Bk. of Louisville v. Lustig,* 961 F.2d 1162 (5th Cir.1992) (*Lustig I* ).

On remand from *Lustig I,* a bifurcated jury trial resulted in awards for First National Bank of Louisville (FNBL) on the bond coverage issues and for FNBL on its bad faith denial of coverage claim. The Sureties again appeal to this Court contending (1) that insufficient evidence exists to support a favorable verdict on FNBL's bad faith claims for denial of coverage; (2) that the district court erred in awarding attorney's fees and costs to FNBL for its bad faith claims under Kentucky law; (3) that the district court erred in denying the Sureties' motion for sanctions and their related fraud-on-the-court claims; (4) that the district court erred in permitting FNBL to allocate the sale proceeds of its loan collateral to interest as opposed to applying the proceeds to FNBL's stated loss; (5) that the district court made various evidentiary errors which prejudiced the Sureties' defense of this case; and (6) that the special interrogatories submitted by the district court confused and misled the jury.[1]

Finding that the district court erred in denying the Sureties' Motion for Judgment as a Matter of Law on FNBL's bad faith claims, we reverse the judgment of the district court awarding consequential damages to FNBL. We also reverse the district court's award of $5.85 million in attorney's fees for the bad faith claims. On the remaining issues, we affirm the district court's decision to permit FNBL to allocate the sales of loan collateral against unpaid interest on the loans at issue. After reviewing the record, we also hold that FNBL, its attorneys, and the United States Attorney, did not engage in a fraud on the court and, therefore, we affirm the district court's decision to deny sanctions on these grounds. We further find no abuse of discretion in the district court's evidentiary rulings regarding the admission of the bank officer's plea agreement, the admission of testimony concerning the circumstances surrounding the plea, and the admission of testimony of FNBL witnesses on its policy coverage claim. Finally, we find no abuse of discretion concerning the district court's submission of the special interrogatories to the jury.

---

1. The Sureties do not appeal the jury's findings    of coverage under the bond.

## I.

This dispute arises from over $20 million in losses sustained by FNBL due to the dishonest or fraudulent activities of an overzealous loan officer, Kevin DeWitt. DeWitt was the loan officer for the eight failed real estate projects at issue. DeWitt joined FNBL's management training program after he graduated from college in 1983. FNBL trained DeWitt and then assigned him to the Construction Loan Division where he prepared credit approval applications and administered the closing and payout of large commercial real estate loans. DeWitt presented these eight construction loans to FNBL's loan committee for approval at various times between 1984 and 1986. The individual loan amounts ranged from $1.9 million to $10.9 million.

The Sureties had issued FNBL a standard Banker's Blanket Bond to cover acts of employee fraud and dishonesty resulting in losses to FNBL. In 1986, FNBL filed a $20 million claim under this policy for losses suffered in connection with DeWitt's eight failed real estate financing projects. To recover under the bond, FNBL had to show that it suffered a "loss *resulting directly* from dishonest or fraudulent acts of an Employee...." (Emphasis added.)

Section (A) of the Insuring Agreement further defines the scope of the bond coverage:

Dishonest or fraudulent as used in this Insuring Agreement *shall mean only* dishonest or fraudulent acts committed by such Employee *with the manifest intent* (a) *to cause the Insured to sustain such a loss, and*

(b) *to obtain financial benefit for the Employee or for any other person or organization intended by the Employee to receive such benefit,* other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment.

(Emphasis added.)

The Insuring Agreement also contains a termination or cancellation of coverage provision which would effectively end coverage when FNBL learns of related fraudulent acts committed by DeWitt. This provision states:

This bond shall be deemed terminated or canceled as to any Employee or any partner, officer or employee of any Processor—(a) as soon as any Insured, or any director or officer not in collusion with such person, shall learn of any dishonest or fraudulent act committed by such person at any time against the Insured or any other person or entity, without prejudice to the loss of any Property then in transit in the custody of such person....

Termination of the bond as to any Insured terminates liability for any loss sustained by such insured which is discovered after the effective date of such termination.

The Sureties presented evidence that FNBL learned that DeWitt had made misrepresentations during his training program and had acted beyond the scope of his authority well before he made some of the failed loans. While DeWitt was in the training program, his supervisors discovered that he was changing numbers in his credit analysis to make them balance, a technique referred to as "plugging." The parties dispute whether plugging is considered a dishonest practice.

In June 1985, a loan reviewer discovered deficiencies in one of DeWitt's loans. After meeting with DeWitt, the reviewer informed FNBL officials that DeWitt had distorted the credit history of a guarantor and did not write the loan to a borrower included in the original documentation. FNBL also knew that DeWitt had closed two of the failed loans at issue "outside of approval" by not following FNBL's established procedures for loan approval. Furthermore, in 1985, an FNBL official discovered that DeWitt lied about whether the "Odyssey Two" loans had been approved by the Executive Loan Committee. DeWitt was not formally disciplined by the bank for these acts. Instead, notwithstanding these questionable practices, DeWitt was recommended for a bonus, promoted, and praised for his "extraordinary" results. The Sureties contend that FNBL's knowledge of DeWitt's dishonest loan practices triggered the bond's termination clause and, as a result, ended FNBL's coverage under the bond.

DeWitt resigned in March 1986 to accept a position at a Baltimore, Maryland bank. Nine days after his resignation, DeWitt received $40,000 from Loretta Lustig through three checks, two checks for $5,000 and another for $30,000. A fourth check for $10,000 was voided. Lustig was either an individual or corporate borrower or guarantor on at least four of the failed real estate loans. Soon after DeWitt left FNBL, testimony revealed that he became a business partner of Lustig. Evidence also showed that DeWitt received approximately 200 shares of Global Development Corporation, a company owned by Lustig. These shares had an estimated value of $788,000. DeWitt never admitted that he received $40,000 from Lustig or that he received stock from one of her companies. DeWitt only admitted that he received a $10,000 loan from Lustig.

Soon after DeWitt left FNBL, serious problems with his loans emerged. In late March, FNBL called DeWitt back to Louisville to meet with bank officials in connection with an investigation of the credit information that he supplied about certain loans. At this meeting, DeWitt admitted to fabricating credit references and later issued a handwritten statement explaining that he falsified information to make good loans and receive recognition at FNBL. The statement further explained that DeWitt did not seek personal gain from customers by submitting these loans. FNBL notified the government of its findings and launched an investigation.

On April 2, 1986, FNBL notified the Sureties of a possible claim under the bond. However, no formal investigation by FNBL or by the Sureties could begin until fifteen months after the notification was sent due to an ongoing FBI investigation. The Sureties determined that certain defenses to coverage were available without receiving any information other than the claim notification.

Almost immediately after FNBL began sending information to the Sureties, Aetna retained the law firm of McCaslin, Imbus & McCaslin as outside counsel. Through their outside counsel, the Sureties then investigated FNBL's claim. The Sureties conducted few interviews and, in fact, interviewed only one FNBL representative. Steven Martin, the lead investigating attorney for McCaslin, Imbus & McCaslin, conducted interviews with DeWitt and Lustig and developed an amicable relationship with their attorneys. The relationship was apparently beneficial as FNBL documents were freely exchanged between Martin and Lustig's attorney Frank Haddad, without FNBL's permission or knowledge. The Sureties never provided the information they received from Lustig to FNBL.

Testimony and other evidence showed that the Sureties knew that the "benefit to an employee" element of the bond coverage in at least four of the DeWitt loans was probably satisfied due to DeWitt's involvement and receipt of money from Lustig in connection with those loans.[2] During settlement negotiations, the Sureties offered to settle the case for $5.5 million. Evidence including testimony showed that the Sureties knew that this offer was well below FNBL's claimed actual loss. FNBL refused to accept this offer and stated that unless the Sureties presented an offer of at least $10 million FNBL would not continue the negotiations. No such offer was made. As a result, in July 1988, FNBL added the Sureties as parties to its previously filed lawsuit against DeWitt and others and the Sureties formally denied liability under the bond.[3]

2. The Double Development loans, LaPalco and Buckhead, and the two Odyssey loans accounted for approximately $15 million of FNBL's claim. It was determined that DeWitt did receive some outside financial benefit from completing these transactions.

3. FNBL filed its original complaint in the United States District Court in New Orleans, Louisiana, in April 1988 against Robert Farmigoni, Loretta Lustig, residents of Louisiana, Fidelity & Deposit Company of Maryland, American Casualty Company of Reading Pennsylvania, and First Finan-

cial of Louisiana Savings & Loan Association, a Louisiana banking association. This diversity action was consolidated with FNBL's complaint against the Sureties because the court found that the case involved the same issues of fact. Since the bond sued upon was issued and delivered to FNBL in Kentucky, the parties agree that the application of the *Erie* Doctrine requires us to apply the substantive law of Kentucky. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 77, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938).

In January 1989, DeWitt appeared before the late Judge Thomas A. Ballentine, United States District Judge for the Western District of Kentucky in Louisville, and tendered a plea of guilty to eight counts of violating 18 U.S.C. § 1005.[4] Judge Ballentine owned stock in the corporate parent of FNBL and offered to recuse himself from the case.[5] Neither the United States nor DeWitt accepted his offer.[6] Judge Ballentine rejected DeWitt's January 1989 offer to plead guilty because he believed that the terms of the plea agreement were too lenient as to time to be served.

Subsequently, in January, 1989, the New Orleans district court in this case granted partial summary judgment for FNBL finding that the offered but rejected guilty plea satisfied the requirements for establishing bond coverage. The district court also struck the Sureties' defense that FNBL's losses were caused by a declining real estate market rather than DeWitt's conduct. The remaining coverage issues were then tried to a jury.[7] The jury found in favor of FNBL and the district court certified its final judgment for the policy limit of $20 million on the coverage phase of this trial pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. Rule 54(b) provides that "the court may direct the entry of a final judgment as to one or more but fewer than all of the claims ... only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." FED.R.CIV.P. 54(b); *and see* *PYCA Indus., Inc. v. Harrison Cty. Waste Water Management Dist.*, 81 F.3d 1412, 1421 (5th Cir.1996). The bad faith portion of this two part trial was not immediately started after the coverage trial because the district court had previously refused to allow discovery to begin.

While discovery was commencing for the bad faith portion of the case, the Sureties appealed the district court's judgment as to the coverage issues, *Lustig I*, 961 F.2d 1162. On appeal, this Court reversed and remanded the case, holding that the district court erred in relying on DeWitt's rejected guilty plea to establish coverage. *Id.* at 1165. While this first appeal was pending, DeWitt re-attempted to plead guilty in his Kentucky criminal case to bank fraud under 18 U.S.C. 1005. Judge Ballentine accepted DeWitt's second plea even though this plea was not substantially different from the original as to the time to be served. FNBL then asked this Court to take judicial notice of the second guilty plea and decide the case. We declined. *Id.*

The Sureties also filed identical motions in the district court and in this Court alleging that FNBL, the United States Attorney's Office, and Judge Ballentine acted inappropriately in structuring the wording of the second plea so as to include factual references which would establish coverage under the bond. The Sureties sought to exclude the guilty pleas on these grounds. The Sureties also maintained that this conduct constituted a fraud-on-the-court and requested an investigation and possible sanctions against FNBL and its attorneys. We declined to address these fraud on the court issues holding that the trial court could better resolve the questions surrounding the second plea agreement by conducting a hearing. *Id.* at 1169.

On remand, the allegations of fraud on the court and the admissibility of the two DeWitt guilty pleas were extensively briefed by the

---

4. 18 U.S.C. § 1005 makes it a crime to "make any false entry in any book, report, or statement of such bank, with intent to injure or defraud such bank, ... or to deceive any officer of such bank, or the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank, or the Board of Governors of the Federal Reserve System."

5. Evidence showed that Ballentine owned $100,-000 to $250,000 in stock in FNBL's parent company.

6. The offer to recuse did not comply with the mandatory provision of the recusal statute and Judge Ballentine was clearly disqualified from hearing DeWitt's criminal case. *See* 28 U.S.C. §§ 455(b)(4), (d)(4) and (e).

7. The district court had previously entered an order bifurcating this trial into a "coverage" phase and a "bad faith" phase.

parties and a hearing was held before a magistrate judge. At the fraud-on-the-court hearing, the Sureties raised the issue of Judge Ballentine's recusal, contending that he should not have heard DeWitt's guilty plea because of his financial interest in FNBL. The Sureties argued that the guilty pleas were tainted because of Judge Ballentine's connection with FNBL and should be excluded.

The Sureties also presented evidence that FNBL had extensive contact with the United States Attorney's Office and substantial input in drafting DeWitt's indictment. Faxes sent by FNBL to the United States Attorney's Office showed that FNBL played a role in crafting the wording of DeWitt's indictment as it related to DeWitt's intent and conduct concerning the bond coverage issues. FNBL suggested the following language for paragraph 4 of the DeWitt indictment:

(4) The preparation of the Credit Approval Form, the Credit Approval Memorandum, and the credit references were accomplished by Kevin DeWitt with respect to the following construction loans:

(a) The Panorama, Inc. loan;

(b) The W & L Holdings, Inc. loan;

(c) The Double Development, Inc. loan on the Lapalco property;

(d) The SCA Westgate, Inc. loan;

(e) The Odyssey One, Inc. loan;

(f) The Consolidated Lewis Investment Corporation Limited Partnership loan;

(g) The Double Development, Inc. loan on the Buckhead property; and

(h) The Odyssey Two, Inc. loan.

On or about and between January 1, 1985 and June 30, 1985, the exact dates being unknown to the United States Attorney in the Western District of Kentucky, Jefferson County, Kentucky, Kevin DeWitt willfully and knowingly, with intent to injure and defraud First National Bank of Louisville by causing it to sustain a loss and to obtain financial benefit for those he intended to receive such benefit and with the intent to deceive officers and directors of the Bank, made various false and fraudulent entries and oral statements in the Bank reports and presentations prepared for, submitted to, presented to and relied upon by the officers and members of the loan committees of the First National Bank of Louisville in connection with the loan request of W & L Holdings, Inc., which caused the loan to be made and caused the loss sustained by the First National Bank of Louisville.

Other facsimiles showed that FNBL made additional suggestions as to language in the indictment. Evidence also demonstrated that FNBL may have had final approval of the finished product.

Before these hearings, FNBL had filed a motion in opposition to the Sureties' motion requesting an investigation into the questions surrounding the DeWitt guilty pleas. In that motion, FNBL stated that "DeWitt's guilty pleas were arms-length negotiated plea agreements between the U.S. Attorney's Office and DeWitt's attorney," and maintained that "FNBL did not dictate, control, or manipulate the guilty pleas." In a subsequent pleading, FNBL asserted that it "never had anything to do with the drafting of DeWitt's Superseding Information." The Sureties' fraud-on-the-court claim arises from FNBL's failure to admit its involvement with drafting the DeWitt guilty pleas, the actual input on drafting of the plea by FNBL, and the specter of impropriety that Judge Ballentine's financial stake in FNBL inserted into these proceedings.

The magistrate judge found no fraud on the court from this conduct and recommended that the guilty pleas and DeWitt's related statements against interest be admitted at trial. The district court adopted the findings of the magistrate judge and held that, under FED.R.CIV.P. 60(b), the Sureties failed to show that they were prevented from fully and fairly presenting their defense. The district court held that the actions of FNBL did not amount to fraud on the court even if FNBL did successfully add charges to the Superseding Information without acknowledging its role in drafting that language. The district court reached this conclusion because the additional language simply mirrored the elements of the criminal statute, 18 U.S.C. § 1005. The district court also held that Judge Ballentine's

failure to recuse himself did not affect De-Witt's voluntary admission of guilt and subsequent plea agreement with the United States Attorney. Finally, the district court refused to exclude DeWitt's second guilty plea from evidence pursuant to FED.R.EVID. 803(22) and held that the prejudicial effects of allowing the plea agreement to be used as evidence did not outweigh its probative value. Instead, the district court allowed the Sureties to attack the credibility of the plea by introducing certain other evidence, but not any evidence relating to the propriety of Judge Ballentine's actions.

The Sureties also had filed a motion for sanctions alleging that FNBL's failure to disclose its involvement with the second De-Witt guilty plea constituted a fraud on the court. The district court denied the Sureties' motion for sanctions, finding that the Sureties raised the same issues in their fraud-on-the-court motion and in their motion to exclude DeWitt's guilty pleas.

The district court then held a two stage jury trial on the issues of coverage and bad faith. After the four week coverage phase of the trial, the jury found that coverage existed and awarded FNBL $17,806,313 in damages for the policy coverage.[8] The same jury then heard evidence relating to the bad faith and unfair settlement practices claims. The jury again found in favor of FNBL and awarded damages of $11.76 million in lost earnings and $5.85 million in attorney's fees. The district court entered judgment against Aetna Casualty & Surety Company and Federal Insurance Company on the coverage claims for $10 million each with interest from the date of judgment. In addition, this judgment included the award of attorneys fees, costs, and lost income of $17,612,631 from the bad faith portion of the trial. An amended judgment held that the amounts recovered by FNBL for sale of collateral would first be applied to lost interest on the real estate loans and that the total attorney's fee award should be reduced by $400,000 for fees asso-

ciated with other litigation. The Sureties filed a timely appeal.

## II.

The Sureties raise a number of issues on appeal. First, they contend that insufficient evidence exists to support the jury's verdict in favor of FNBL on its bad faith denial of coverage claims. Next, the Sureties maintain that the district court erred in awarding attorneys' fees and costs to FNBL. Third, the Sureties contend that the district court erred in failing to impose sanctions on FNBL for its fraud on the court. The Sureties also challenge various evidentiary rulings excluding and admitting certain evidence relating to the DeWitt guilty pleas. Finally, the Sureties contend that the district court erred by submitting confusing interrogatories to the jury in the coverage phase of the trial.

### A. Bad Faith Denial of Coverage Claims

Prior to 1983, Kentucky courts uniformly followed the rule that an insured's recovery for wrongdoing by his insurer was limited to damages obtainable through a breach of contract claim. *General Accident Fire & Life Assur. Corp. v. Judd*, 400 S.W.2d 685, 687 (Ky.1966). However, in *Feathers v. State Farm Fire & Cas. Co.*, 667 S.W.2d 693, 696 (Ky.Ct.App.1983), a Kentucky appellate court recognized for the first time the tort of first party bad faith. This tort had a short life span. In 1986, the Kentucky Supreme Court overruled *Feathers* and refused to recognize the tort of first party bad faith for an insurer's failure to pay claims under an insurance policy. *Federal Kemper Ins. Co. v. Hornback*, 711 S.W.2d 844, 845 (Ky.1986). Three years later, the Kentucky Supreme Court reversed its position and held that a first party insured may recover for bad faith in dealing with its own insurer. *Curry v. Fireman's Fund Ins. Co.*, 784 S.W.2d 176, 178 (Ky.1989). *Curry* provided little operational guidance for this new tort and simply adopted Justice Leibson's dissent in *Federal Kemper* which relied heavily on Wisconsin's

---

8. Specifically, the jury was instructed to find the amount of loss incurred from each loan. The district court further instructed the jury not to add costs, interest or attorneys' fees to their award. The jury awarded $2,852,160 for the W & L loan; $1,478,073 for the LaPalco loan; $1,410,000 for the SCA Westgate loan; $1,399,680 for Odyssey 1; $1,940,431 for the Consolidated Lewis loan; $342,754 for the Buckhead loan; and $8,385,215 for the Odyssey 2 loan.

bad faith tort law. *Id.* (adopting *Federal Kemper,* 711 S.W.2d at 846–47 (citing *Anderson v. Continental Ins. Co.,* 271 N.W.2d 368 (Wis.1978)). After *Curry,* the Kentucky Supreme Court again visited this issue and set out in detail the requirements for a successful bad faith claim in Kentucky. *Wittmer v. Jones,* 864 S.W.2d 885, 889–90 (Ky.1993). Justice Leibson, whose dissent in *Federal Kemper* was later adopted as the law by *Curry,* authored the decision in *Wittmer. Wittmer* now stands as the definitive statement of Kentucky law on bad faith claims, both under the common law as decided by *Curry* and under the various Kentucky statutes speaking to this subject.

■ To prevail on a bad faith claim under Kentucky law,[9] an insured must establish (1) that the insurer is obligated to provide coverage under the terms of the policy; (2) that the insurer had no reasonable basis for denying coverage for the claim; and (3) that the insurer knew there was no reasonable basis to deny the claim or the insurer acted with reckless disregard for whether a basis to deny the claim existed.[10] *Wittmer,* 864 S.W.2d at 890; *Curry,* 784 S.W.2d at 178; *Federal Kemper,* 711 S.W.2d at 846–47. Sufficient evidence of intentional misconduct or reckless disregard of the insured's rights must first exist to show that a tort occurred. Only then is a jury permitted to answer the question of whether consequential and punitive damages are to be awarded. *Wittmer,* 864 S.W.2d at 890–91.

■ Beginning with Justice Leibson's dissent in *Federal Kemper,* and continuing with statements in later cases, it is clear that an insurer may challenge a claim which is fairly debatable on its law or facts. *Federal Kemper,* 711 S.W.2d at 846–849 (Leibson, J., dissenting); *Curry,* 784 S.W.2d at 178; *and see Empire Fire & Marine Ins. Co. v. Simpsonville Wrecker Serv., Inc.,* 880 S.W.2d 886, 890 (Ky.Ct.App.1994). In the present case, the Sureties contend that the bond's coverage was fairly debatable on the law and, as such, the issue of bad faith should not have been submitted to the jury.

■ A determination of whether the issue of bad faith should be submitted to a jury may be made only at the conclusion of both parts of a bifurcated trial. *Federal Kemper,* 711 S.W.2d at 847–48. Therefore, after considering the evidence presented in both parts of the trial in this case we must be convinced that FNBL presented sufficient evidence of bad faith as a matter of law to show that the Sureties had no reasonable ground for disputing the policy's coverage. *Id.*

The Sureties first argue that there was a genuine dispute regarding whether the losses allegedly caused by DeWitt's fraudulent loan practices were types of occurrences covered by the terms of the bond. This contention rests on the fact that the definition of "manifest intent" had not yet been determined under Kentucky law. Because of the uncertainty of the law as it related to the definition of manifest intent, the Sureties argue that they had a reasonable basis in law to refuse to pay the claim.

The Sureties also argue that they had a reasonable basis to deny the claim when they were informed that FNBL had previously discovered that DeWitt falsified certain reports in his training program and later during his employment with the construction loan division. The Sureties contend that this illicit conduct triggered the termination clause of the bond. Questions surrounding FNBL's knowledge of DeWitt's activities raised both legal and factual grounds on which to deny coverage.

The Sureties further argue that they had reasonable grounds to challenge FNBL's coverage claim because questions existed as to whether the loan committee relied on DeWitt's representations in making some of the disputed loans. Finally, the Sureties main-

---

**9.** No party disputes that Kentucky law controls the outcome of this case.

**10.** FNBL also alleged statutory claims under the Kentucky Unfair Claims Settlement Practices Act (KUCSPA), Ky.Rev.Stat.Ann. §§ 304.12–230, 304.12–235 (Michie/Bobbs–Merrill 1992). Kentucky courts apply the same three part test to both the common law bad faith claims and claims brought under KUCSPA. *Wittmer,* 864 S.W.2d at 890 (applying the three part test for common law bad faith to claims brought under KUCSPA); *and see State Farm Mut. Auto Ins. Co. v. Reeder,* 763 S.W.2d 116, 118 (Ky.1988).

tain that FNBL failed to present sufficient evidence to show that the Sureties knew there was no reasonable basis to deny the claim or that the Sureties acted with reckless disregard for the rights of the insured.

In support of their contention that the scope of manifest intent had not been defined in Kentucky, the Sureties cite to other jurisdictions defining manifest intent. "The manifest intent provision ... limit[s] protection under this bond to losses due to embezzlement or embezzlement-like acts." *Glusband v. Fittin Cunningham & Lauzon, Inc.*, 892 F.2d 208, 212 (2d Cir.1989); *but see First Federal Sav. & Loan Ass'n of Salt Lake City v. Transamerica Ins. Co.*, 935 F.2d 1164, 1166–67 (10th Cir.1991) and *Municipal Securities, Inc. v. Insurance Co. of N. America*, 829 F.2d 7, 9 (6th Cir.1987) (adopting a somewhat less strict standard than embezzlement-like acts to impose coverage under a banker's blanket bond).

In support of their argument that a legally debatable basis exists for denial of coverage under the bond, the Sureties also rely on our finding in *Lustig I* that manifest intent was a fact question for the jury. *Lustig I*, 961 F.2d at 1165–66. The Sureties maintain that the question of bad faith should never have been submitted to the jury because there were fact questions as to whether DeWitt possessed the requisite manifest intent to cause FNBL to sustain a loss and as to whether DeWitt intended to benefit himself or others by his conduct to trigger coverage under the bond.

The Sureties cite *Empire Fire & Marine* in support of their position that if the law is unclear, no finding of bad faith may be made. *Empire Fire & Marine*, 880 S.W.2d at 890. In *Empire Fire & Marine*, the insurer contested coverage under a cargo transportation policy based on the fact that the cargo, as opposed to the cargo's transporting vehicle, collided with an overpass. *Id.* at 887. The Kentucky Court of Appeals had to determine whether sufficient evidence was presented at trial to show that the insurer's refusal to pay the claim was in bad faith. *Id.* at 888. The insurer took the position that no coverage existed under the policy if the insured's cargo, but not the carrier's vehicle, struck another object. The court of appeals found the insurer's position fairly debatable and found no bad faith refusal to pay based on the fact that this was a case of first impression in Kentucky and that other state courts had reached varying outcomes in addressing this issue. *Id.* at 890.

■ We begin our analysis with a determination of whether FNBL proved the three factors necessary to establish a bad faith claim in Kentucky. *See Wittmer*, 864 S.W.2d at 890. At the conclusion of the coverage phase of the trial, the jury determined that coverage existed. On appeal, the parties do not dispute that the Sureties are obligated to pay the claim under the terms of the policy and, therefore, the parties do not contest the first factor under the bad faith analysis. *See id.* The second factor, whether FNBL proved that the Sureties lacked a reasonable basis in law or fact for denying this claim, is disputed. Under this factor, if a genuine issue exists as to either questions of law or fact, FNBL's claim is considered fairly debatable and the bad faith tort claim may not be maintained. *Id.; and see Empire Fire & Marine*, 880 S.W.2d at 890.

■ According to *Empire Fire & Marine*, there are two ways in which a claim may be fairly debatable: (1) if the issue is one of first impression in Kentucky and authorities from other jurisdictions support the insurer's position and (2) if a dispute over relevant facts related to coverage exists. *Empire Fire & Marine*, 880 S.W.2d at 889–890. After reviewing the record, we find FNBL's claim fairly debatable on both grounds discussed in *Empire Fire & Marine*.

The definition "manifest intent" as it relates to coverage under a banker's blanket bond is one of first impression for Kentucky. At the time FNBL presented its proof of loss, no court in the nation had wrestled with the definitional scope of manifest intent as it relates to a banker's blanket bond.[11] Subse-

---

11. The banker's blanket bond was changed in 1976 to add the "manifest intent" provision to the terms of the policy. *See Hartford Acc. and*

*Indem. Ins. Co. v. Washington Nat'l Ins. Co.*, 638 F.Supp. 78, 81 (N.D.Ill.1986); Judy J. Hlafesak, Comment, *The Nature and Extent of Subrogation*

quently, the law has been somewhat clarified by a number of decisions. *F.D.I.C. v. United Pacific Ins. Co.*, 20 F.3d 1070, 1078 (10th Cir.1994); *Heller Int'l Corp. v. Sharp*, 974 F.2d 850, 859 (7th Cir.1992); *First Federal Sav. & Loan Assoc. of Salt Lake City*, 935 F.2d at 1166 n. 3; *F.D.I.C. v. St. Paul Fire and Marine Ins. Co.*, 942 F.2d 1032, 1035–36 (6th Cir.1991); *Leucadia, Inc. v. Reliance Ins. Co.*, 864 F.2d 964, 972–73 (2d Cir.1988), *cert. denied*, 490 U.S. 1107, 109 S.Ct. 3160, 104 L.Ed.2d 1023 (1989); *United States Fidelity & Guar. Co. v. Citizens Bank of Tazewell*, 718 F.Supp. 471, 474 (W.D.Va.1989); *Hartford Accident & Indem. Ins. Co.*, 638 F.Supp. at 84; *Susquehanna Bancshares, Inc. v. National Union Fire Ins. Co. of Pittsburgh*, 442 Pa.Super. 281, 659 A.2d 991, 994–95 (1995); *North Jersey Sav. & Loan Ass'n v. Fidelity and Deposit Co. of Maryland*, 283 N.J.Super. 56, 660 A.2d 1287, 1292–93 (Law Div.1993); *Hanson PLC v. National Union Fire Ins. Co. of Pittsburgh*, 58 Wash.App. 561, 794 P.2d 66, 72 (1990); *National Bank of Pakistan v. Basham*, 142 A.D.2d 532, 531 N.Y.S.2d 250, 251 (N.Y.Sup.Ct.1988), *aff'd*, 73 N.Y.2d 1000, 541 N.Y.S.2d 345, 539 N.E.2d 101 (1989).

Many of these courts adopted a more objective type of test which "does not require that the employee actively wish for or desire a particular result; rather, manifest intent exists when a particular result is substantially certain to follow from the employee's conduct." *United Pacific Ins. Co.*, 20 F.3d at 1078. Confusion arises when courts attempt to gage to what extent it is necessary to show subjective intent to harm the bank. Most courts have considered both objective and subjective factors to determine whether an employee possessed the manifest intent to harm required by the banker's blanket bond. *Id.; but see St. Paul Fire and Marine*, 942 F.2d at 1035; *Citizens Bank of Tazewell*, 718 F.Supp. at 473–74; *Basham*, 531 N.Y.S.2d at 251 (considering only external behavior of the bank employee to determine manifest intent).

In *Lustig I*, we explained that the fraudulent activities of DeWitt did not lie squarely within the parameters of embezzlement type acts and it could not be readily determined that DeWitt possessed the required manifest intent to harm the bank. *Lustig I*, 961 F.2d at 1165–66. We also recognized that DeWitt's actions were not simply those taken by a highly-driven loan officer who merely sought to increase his stature within the bank by making more loans. *Id.* As we explained in *Lustig I*,

> [T]o determine intent to cause a loss we do not inquire solely into the subjective motive or purpose of the employee. *See St. Paul Fire and Marine*, 942 F.2d at 1035 (courts must rely upon inferences from tangible manifestations of behavior, not merely upon actor's subjective mental state to determine intent). Thus, the claim by an errant employee that no loss to the bank was intended will seldom be conclusive. When an employee obtains fraudulent loans with reckless disregard for a substantial risk of loss to the bank, a jury may infer from his reckless conduct and surrounding circumstances that he intended to cause that loss. The bank need not produce any direct evidence of the employee's intent, but may rebut ... with circumstantial evidence from which a reasonable jury could infer the intent to cause a loss.

*Lustig I*, 961 F.2d at 1166. The majority of cases cited support the conclusion reached by the Sureties that the subjective intent of the employee is factored into the analysis of whether an employee possessed the manifest intent to harm the bank. However, the factors to be considered are not clearly defined.

Factual questions certainly existed as to whether DeWitt intended to harm FNBL. In his initial statement to the bank, DeWitt stated that he never intended to harm the bank. It was only later, in the second plea taken by Judge Ballentine, that DeWitt pleaded to:

> willfully and knowingly, with the intent to injure and defraud First National Bank of Louisville, and to deceive any officer of

*Rights of Fidelity Insurers Against Officers and Directors of Financial Institutions*, 47 U.Pitt.L.Rev. 727, 729–732 (1986). (This comment provides a historical perspective on the inclusion of the manifest intent language in the banker's blanket bond.)

said bank in connection with loans for the benefit of others, thereby causing a loss to said bank, made various false entries and statements in the bank reports and statements of the said First National Bank, prepared for and submitted to and relied upon by the Loan Committee and officers of the First National Bank of Louisville....

■ Therefore, because Kentucky has not yet defined "manifest intent" and because of the lack of certainty in this case concerning whether manifest intent was based on the subjective intent of DeWitt or the objective result of his conduct, we hold that the Sureties possessed a legally debatable basis for denying FNBL's claim. Furthermore, the Sureties had a factual basis upon which to contest FNBL's claim based on DeWitt's refusal to admit to intending to harm the bank, the questions surrounding the validity of the plea, and DeWitt's refusal to testify in this case.

■ Next, the Sureties properly relied on the bond's termination clause to challenge coverage in this case. The Sureties presented evidence which showed that FNBL learned of DeWitt's propensity to make fraudulent representations and act beyond the scope of his authority well before he made some of the failed real estate loans.

In *Lustig I*, we agreed that sufficient evidence had been presented to create a fact question for the jury as to whether the termination provision of the bond had been triggered. *Lustig I*, 961 F.2d at 1168. In the second coverage trial after remand, the district court submitted the issue of termination to the jury. After hearing the testimony and reviewing the evidence dealing with DeWitt's prior misconduct, the jury found that the termination provision of the bond had not been triggered. The jury determined that these dishonest practices engaged in by DeWitt and discovered by FNBL did not put FNBL on notice for purposes of terminating coverage under the bond. However, sufficient evidence was presented whereby this same jury could have reached the opposite determination, i.e., that the termination clause of the bond was triggered. This would have ended the coverage dispute. As

such, this issue presented as a matter of law a fairly debatable basis on which to deny coverage.

■ Finally, FNBL failed to present sufficient evidence to show that the Sureties knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed. *See Wittmer*, 864 S.W.2d at 890. The Sureties argue, and we agree, that no evidence showed that the Sureties acted with reckless indifference to FNBL's rights under the bond and, therefore, the claim of bad faith should not have been submitted to the jury. As stated by the Kentucky Supreme Court in *Wittmer*:

"The essence of the question as to whether the dispute is merely contractual or whether there are tortious elements justifying an award of punitive damages depends first on whether there is proof of bad faith and next whether the proof is sufficient for the jury to conclude that there was 'conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others.' RESTATEMENT (SECOND) TORTS, Sec. 909(2) (1979), as quoted and applied in *Horton v. Union Light, Heat and Power Co.*, [ ] 690 S.W.2d 382, 388–90 ( [Ky.] 1985)." *Federal Kemper*, [ ] 711 S.W.2d at 848.

This means there must be sufficient evidence of intentional misconduct or reckless disregard of the rights of an insured or a claimant to warrant submitting the right to award punitive damages to the jury.

*Wittmer*, 864 S.W.2d at 890. The Kentucky Supreme Court decided *Wittmer* during the course of the district court's proceedings in this case and we consider its clarification of the law on bad faith claims as controlling. Before submitting a bad faith claim to a jury, *Wittmer* requires an insured to show sufficient evidence of outrageous conduct on the part of an insurer, committed because of the insurer's evil motive or its reckless indifference to the rights of others. Our review of the record in this case reveals no testimony or evidence upon which a reasonable jury could find "outrageous conduct" on the part of the Sureties based on an "evil motive" or a

"reckless indifference" to the rights of FNBL. Therefore, the district court erred in submitting FNBL's bad faith claim to the jury.

FNBL failed to establish the second and the third prong of the three part *Wittmer* test to prove bad faith under Kentucky law. *See id.* As discussed above, the Sureties had several legitimate grounds to dispute coverage. Therefore, after a complete review of the record, we are convinced that the Sureties had both legal and factual grounds for denying this claim under Kentucky law and we reverse the district court's judgment awarding consequential damages for bad faith and render judgment that FNBL take nothing on this claim.

### B. Attorneys' Fees and Costs

The district court's judgment awarding $5.85 million to FNBL in attorneys' fees and costs is not supported by Kentucky statutes or common law. The Sureties correctly argue that an award of attorneys' fees is impermissible unless expressly authorized by statute or contract. *Louisville Label, Inc. v. Hildesheim,* 843 S.W.2d 321, 326 (Ky. 1992); *Blue Cross & Blue Shield of Kentucky, Inc. v. Whitaker,* 687 S.W.2d 557, 560 (Ky.Ct.App.1985). Further, the Sureties maintain that nothing in the insurance contract authorizes an award of attorneys' fees.

Kentucky adheres to the "American Rule" which does not allow awards of attorneys' fees unless expressly authorized by statute or contract. *Whitaker,* 687 S.W.2d at 560. While Kentucky recognizes certain exceptions to the "American Rule", *Indiana Nat'l Life Ins. Co. v. Butler,* 215 S.W. 949, 950 (Ky.1919) (where the defendants' wrongful conduct compelled the plaintiff to incur legal fees and expenses in a prior legal proceeding); *Lexington–Fayette Urban Cty. Gov't v. Middleton,* 555 S.W.2d 613, 618 (Ky.Ct.App. 1977) (attorneys' fees allowed in action for malicious prosecution and false arrest in defending prior criminal action), the parties agree that these exceptions do not apply in the present case.

FNBL brought this claim alleging that the Sureties violated Ky.Rev.Stat.Ann. § 304.12–230 by engaging in unfair claims settlement practices and Ky.Rev.Stat.Ann. § 304.12–235 by failing to pay its claims within the time limits required by that statute. Section 304.12–235(3) states that when "an insurer fails to settle a claim ... the insured person or health care provider shall be entitled to be reimbursed for his reasonable attorney's fees incurred." Ky.Rev.Stat.Ann. § 304.12–235(3). In this case, however, the jury found no violation of § 304.12–235 by the Sureties. Section 304.23–235 may not be applied to FNBL's § 304.12–230 claims because *FB Ins. Co. v. Jones,* 864 S.W.2d 926, 929 (Ky.Ct. App.1993), expressly rejected the assertion that § 304.12–235 provides a remedy for violations of § 304.12–230 (unfair claims settlement practices). No other Kentucky statute authorizes attorneys' fees and costs for violations of § 304.12–230. Therefore, even if we had affirmed the district court's judgment awarding consequential damages for bad faith, FNBL would not have been entitled to attorneys' fees under Kentucky law.

In *Blue Cross & Blue Shield of Kentucky v. Whitaker,* 687 S.W.2d at 560, the Kentucky Court of Appeals acknowledged that consequential damages are recoverable in cases involving insurance bad faith but held that:

[w]hile many jurisdictions have provided for attorney fees to be recoverable in bad faith actions, this is a determination more properly left to the legislature. Thus, we can only refer to the language of another recent decision of this court which stated:

"... Kentucky courts have been consistently reluctant to uphold awards of attorney's fees except for those particular instances when such fees are authorized by a statute or a contract expressly providing therefore."

*Id.* at 560 (quoting *White v. Sullivan,* 667 S.W.2d 385, 389 (Ky.Ct.App.1983). The cases cited by FNBL recognize a narrow exception to this general rule and permit recovery for attorney's fees where the defendant's conduct caused the plaintiff to incur legal expenses in a prior legal proceeding. *See e.g., Indiana Nat'l Life,* 215 S.W. at 950; *Lexington–Fayette,* 555 S.W.2d at 619. However, FNBL does not seek attorneys' fees incurred in a prior litigation. Consequently, the district court's judgment award-

ing attorney's fees and costs to FNBL is reversed and we render judgment that FNBL take nothing as to its claim for attorneys' fees as part of its bad faith claim.

### C. Sale Proceeds of the Loan Collateral

■ The Sureties contend that the district court erred in allowing FNBL to allocate its sales of loan collateral against unpaid interest on the eight DeWitt loans, rather than against the amount of loss claimed against the Sureties. The loans at issue in this case were collateralized by real estate that FNBL resold for $10 million. The district court allowed FNBL to treat the $10 million as interest collected on the outstanding loans rather than as principal repaid. This distinction draws its import from Section 2(t) of the bond. This provision expressly excludes coverage for "potential income, including ... interest ... not realized by the Insured." Consequently, FNBL was permitted to maximize its covered loss by applying the $10 million to unpaid interest rather than the loan principal.

The Sureties' contention rests on Section 7(c) of the bond's Conditions and Limitations which addresses the allocation of recoveries by the insured:

> Recoveries, whether effected by the Underwriter or by the Insured, shall be applied net of the expense of such recovery first to the satisfaction of the *Insured's loss in excess of the amount paid under this bond*, secondly, to the Underwriter as reimbursement of amounts paid in settlement of the Insured's claim, and thirdly, to the Insured in satisfaction of any Deductible Amount.

(Emphasis added.)

The district court relied on the "loss in excess of the amount paid under this bond" language to conclude that Section 7 was inapplicable to recoveries made before the insurer paid for the loss. The Sureties contend that the district court misinterpreted Section 7. The Sureties maintain that Section 7 should govern the allocation of recoveries even if nothing has been paid under the bond. Furthermore, the Sureties maintain that the district court's interpretation of Section 7(c) is impossible to reconcile with Section 7(e) of the bond. Section 7(e) provides that "[FNBL] shall do nothing after discovery of loss to prejudice" the Sureties' right to obtain reimbursement from recoveries effected by FNBL.

■ We review the district court's interpretation of the bond contract *de novo. Clardy Mfg. Co. v. Marine Midland Bus. Loans Inc.*, 88 F.3d 347, 352 (5th Cir.1996). Sections 7(a) and (b) of the bond agreement clearly contemplate assignment or recovery "in the event of payment under this bond." Section 7(c) follows suit and refers to recoveries as applied to satisfy the insured's loss in excess of the amount paid under the bond. Section 7(e) provides that "[t]he Insured shall execute all papers and render assistance to secure to the Underwriter the rights and causes of action provided for herein. The Insured shall do nothing after discovery of loss to prejudice such rights or causes of action." After reading section 7(e) in conjunction with the bond agreement and Section 7, we do not interpret Section 7(e) to impose responsibilities on the insured to refrain from actions which may prejudice the rights of the insurer unless a payment under the bond has been made. Section 7 clearly refers to activities after the insurer made payments pursuant to the terms of the bond.

After reviewing the bond contract, we hold that the district court correctly interpreted the bond agreement, specifically Section 7, to permit FNBL to retain the proceeds of the sales of its loan collateral. Section 7(e) does not act as a "catch-all" provision under the assignment/recovery section of the bond to limit actions by an insured when the insurer has not made payments under the bond. For these reasons, we hold that the bond contract does not control or require that the proceeds from the loan sales be applied first to the "Insured's loss in excess of the amount paid under the bond." As result, FNBL was entitled to allocate those recoveries to the interest due on the outstanding loans.[12]

---

12. In the absence of the bond contract, Kentucky law permits FNBL to allocate the sale proceeds to accrued interest. *See* KY.REV.STAT.ANN. § 360.020(2) ("Partial payment on a debt bearing

Therefore, we affirm the district court's judgment allowing FNBL to apply the loan sales recoveries to accrued interest.

## D. Third–Party Litigation Defense Costs

■ The district court's judgment on FNBL's coverage claims included approximately $1.8 million in attorneys' fees and costs incurred by FNBL in defending three lawsuits brought by third parties against FNBL.[13] The judgment reflected the jury's findings that, for each of the three lawsuits, the Sureties were obligated to reimburse FNBL for those costs. The district court submitted this issue to the jury based on General Agreement F which states:

> The Underwriter shall indemnify the Insured against court costs and reasonable attorneys' fees incurred and paid by the Insured in defending any suit or legal proceeding brought against the Insured to enforce the Insured's liability or alleged liability on account of any loss, claim or damage which, if established against the Insured, would constitute a collectible loss under this bond in excess of any Deductible Amount.

The district court instructed the jury as follows:

> To determine whether the Sureties are liable for the Bank's attorneys' fees and court costs in defending those three lawsuits, you must first consider the three lawsuits mentioned above and decide whether at least one of the allegations in each lawsuit, if established against the Bank, would be a loss resulting from De-Witt's fraud or dishonesty within the meaning of the insurance policy. The Sureties' duty to reimburse the Bank is determined at the outset of such third party litigation, and it is not dependent in any way on whether the lawsuit is successful or unsuccessful.

The Sureties failed to object to or challenge the jury instructions and the net award.

The Sureties contend that the third party complaints at issue do not allege or imply

that DeWitt intended to cause FNBL to sustain a loss. Further, the Sureties maintain that each complaint alleges that FNBL knew about DeWitt's fraudulent lending activities and dishonesty before the eight loans at issue were made. Therefore, the bond's termination provision would have ended coverage.

Because the Sureties did not raise objections to the jury instructions regarding General Agreement F, FNBL contends that this issue must be reviewed as a complaint challenging the sufficiency of the evidence. FNBL argues that a reasonable jury could conclude that FNBL was entitled to recover its defense costs for litigating these three lawsuits based on the evidence presented. The dishonest acts of DeWitt relied upon by FNBL to establish liability under the bond were the same acts at the core of the three lender liability claims against FNBL. FNBL also argues that the "pleadings only" rule does not require that the third party pleadings explicitly allege facts relating to DeWitt's conduct. See *Continental Sav. Ass'n v. United States Fidelity and Guar. Co.*, 762 F.2d 1239, 1244 (5th Cir.1985). Finally, FNBL contends that, even if we interpret the "pleadings only" rule narrowly, the underlying conduct at issue in the three third-party complaints arises from DeWitt's fraudulent activities and should have required the Sureties to defend these cases.

■ Kentucky courts have not yet construed General Agreement F. Nevertheless, the parties generally agree that the "pleadings only rule" applies to this case. Under this rule, the Sureties' duty to reimburse FNBL arose when a third party sued FNBL on allegations that, if taken as true, potentially stated a cause of action within the terms of the policy. *Id.* at 1243. We agree with FNBL that the three complaints at issue potentially stated a cause of action within the terms of the policy so as to require the Sureties to reimburse FNBL for the costs of litigating these claims.

interest shall be first applied to the interest then due.").

13. The original award totaled $2,184,120 on this claim. The district court reduced the award by $400,000 because of a payment by another insurer to FNBL.

In the first claim, Pelican Homestead & Savings Association versus FNBL, Pelican alleged that FNBL dealt unfairly with Pelican's predecessor-in-interest in the course of presenting a $1.3 million letter of credit for payment. Pelican alleged that FNBL had notice that DeWitt was engaging in unsound lending practices from the time he was in the bank's training program. This allegation, cited as support for the termination clause defense by the Sureties, shows that the claim potentially stated a cause of action within the terms of the policy. The complaint focused on allegations of FNBL's unsound lending practices which arose from the actions of DeWitt. Whether the termination clause was triggered is irrelevant to determining whether a potential cause of action was stated under the terms of the policy. Because the complaint arises from the fraudulent activities of DeWitt, the jury could and did conclude that the Pelican complaint potentially stated a cause of action under the policy which triggered the Sureties' duty to reimburse FNBL in this case.

Similarly, Chester LeBlanc, a guarantor on the W & L loan, brought suit against FNBL alleging that DeWitt acted dishonestly with other FNBL officers by inducing LeBlanc to provide a personal guaranty and by failing to provide promised sums of money to W & L. This complaint on its face states a potential cause of action under the terms of the bond agreement. The possibility that these bank officers and DeWitt were conducting business for their own benefit triggers the Sureties' duty to reimburse FNBL under General Agreement F.

Finally, Don and Dale Sharon Gray ("the Grays"), guarantors of the Odyssey I and Odyssey II loans, brought suit against FNBL alleging that DeWitt and FNBL fraudulently induced them to execute personal guaranties in favor of FNBL. The Grays also included language which alleged that FNBL was notified of DeWitt's fraudulent conduct. Further, this complaint specifically alleged that DeWitt committed fraud.

We find these allegations legally sufficient to support the jury's findings that the Sureties were obligated under General Agreement F to reimburse FNBL for costs associated with defending these lawsuits.[14] The Sureties' duty to reimburse FNBL arose when FNBL was sued on the allegations that, if taken as true, potentially stated a cause of action within the terms of the policy. All three complaints arise out of DeWitt's fraudulent activities and potentially stated a cause of action within the terms of the policy. For the foregoing reasons, we affirm the district court's judgment.

### E. Fraud on the Court/Sanctions

While *Lustig I* was pending on appeal, DeWitt pleaded guilty to an eight count Superseding Information charging him with violating 18 U.S.C. § 1005. Judge Ballentine accepted this second plea even though the punishment was indistinguishable from the prior plea which Judge Ballentine had rejected because of its leniency. FNBL filed a request for this Court to take judicial notice of the second plea. We declined. *See Lustig I*, 961 F.2d at 1169.

Noting the language differences between the pleas and Judge Ballentine's substantial financial interest in FNBL's holding company, the Sureties filed motions in this Court and in the district court seeking to prohibit the use of the guilty pleas and requesting an investigation into the possible fraud on the court by FNBL in connection with its involvement with the drafting of the Superseding Information. We also refused to address the fraud on the court and sanctions claims. *Id.* We remanded stating that these issues would be best handled by the district court through a hearing or otherwise. *Id.* On remand, extensive briefing and hearings were held on the admissibility of the pleas and the fraud-on-the-court/sanctions issues.

The Sureties' contentions rest on FNBL's involvement with the drafting of DeWitt's Superseding Information through its communications with the United States Attorney's Office. Various facsimiles between FNBL

---

14. The Sureties failed to object to the jury instructions on this issue and have waived arguments contesting the propriety of those instruc-tions. *Thrift v. Hubbard,* 44 F.3d 348, 354 (5th Cir.1995).

attorneys and Alexander Taft, an Assistant United States Attorney, demonstrated that FNBL did in fact have a substantial role in suggesting the language to be included in DeWitt's Superseding Information. The Sureties' fraud-on-the-court arguments focus on this improper contact and FNBL's failure to admit in a prior motion that it was involved in the drafting of the information.

FNBL had filed a motion in opposition to the Sureties' motion requesting an investigation into the questions surrounding the DeWitt guilty pleas. FNBL stated that "DeWitt's guilty pleas were arms-length negotiated plea agreements between the U.S. Attorney's Office and DeWitt's attorney," and maintained that "FNBL did not dictate, control, or manipulate the guilty pleas." FNBL also asserted that it "never had anything to do with the drafting of DeWitt's Superseding Information." The Sureties contend that FNBL's failure to admit its involvement with drafting the DeWitt guilty pleas, FNBL's actual input on drafting of the plea and Judge Ballentine's failure to recuse himself from DeWitt's criminal case demonstrate a fraud on the court.

The magistrate judge held an evidentiary hearing on the issue and found that FNBL committed no fraud on the court. Specifically, the magistrate judge found no evidence that DeWitt did not commit the crime to which he pleaded guilty, that he was improperly charged, that the language in the Superseding Information was untrue, or that any of the language contained in the superseding information was false. The district court adopted the report and recommendation of the magistrate concluding that FNBL's actions did not rise to the level of a fraud on the court.[15]

In making its findings, the district court relied on FED.R.CIV.P. 60(b)(3) for guidance. While applying the Rule 60(b)(3) standards to the present case, the district court recognized that fraud-on-the-court arguments generally arise during post-judgment motions for relief. The Sureties never objected to the district court's application of Rule 60.

The district court began its analysis by noting the procedural problem this case presents. Under Rule 60, the first test for fraud on the court is whether the action in question prevented a party from fully and fairly litigating its case. Because no judgment had been rendered in the case, the district court found that the Sureties had not been prevented from defending their case. In an abundance of caution, however, the district court reviewed the case as if no procedural bar existed and considered whether the alleged conduct of FNBL would have prevented the Sureties from fully and fairly litigating their case.

Both parties' arguments relied heavily on *Hazel–Atlas Glass Co. v. Hartford–Empire Co.*, 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944). In *Hazel–Atlas*, the Court held that fraud on the court occurred when the defendant prepared and arranged for publication in a trade journal a favorable article signed, but not actually written by, an independent expert. *Id.* at 250, 64 S.Ct. at 1003. The Court found that the defendant had engaged in an elaborate scheme to defraud the Patent Office and the Third Circuit and emphasized that the article was effective in that the defendant obtained a patent and prevailed on appeal. The Court stated "[t]he article, even if true, should have stood or fallen under the only title it could have honestly have been given—that of a brief in behalf of Hartford prepared by Hartford's agents, attorneys and collaborators." *Id.* at 247, 64 S.Ct. at 1002.

The district court found *Hazel–Atlas* instructive but distinguishable from the present case. The district court explained that, unlike *Hazel–Atlas*, the language in the Superseding Information was not the definitive issue in the case. The district court further found that "[e]ven if FNBL's input affected the document, it did so with the Assistant U.S. Attorney's knowledge and consent. Indeed, without his assent and his affirmative acts, the additional language could not find its way into the document."

Based on this reasoning, the district court found that the Sureties failed to prove by

15. Before the district court issued its decision, the Sureties filed a motion for sanctions which

was grounded on the same basis as their fraud on the court motion.

clear and convincing evidence that they had been prevented from fully and fairly presenting their defense. Further, Judge Ballentine's involvement in the criminal case cannot be a fraud on the court in the related civil case because Judge Ballentine's participation did not affect DeWitt's voluntary admission of guilt. Based on these reasons, and after reviewing extensive testimony proffered by the Sureties, the district court adopted the findings of the magistrate judge.[16] The district court also denied the Sureties' motion for sanctions, finding that no fraud on the court was committed to warrant the imposition of sanctions.

▮ To establish fraud on the court, " 'it is necessary to show an unconscionable plan or scheme which is designed to improperly influence the court in its decision.' " *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1338 (5th Cir.1978) (quoting *England v. Doyle*, 281 F.2d 304, 309 (9th Cir.1960)).

> Generally speaking, only the most egregious misconduct, such as bribery of a judge or members of a jury, or the fabrication of evidence by a party in which an attorney is implicated, will constitute a fraud on the court. *See Hazel–Atlas Glass Co. v. Hartford–Empire Co.*, 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944); *Root Refin. Co. v. Universal Oil Products*, 169 F.2d 514 (3d Cir.1948); 7 J. Moore, FEDERAL PRACTICE, ¶ 60.33 at 510–11. Less egregious misconduct, such as nondisclosure to the court of facts allegedly pertinent to the matter before it, will not ordinarily rise to the level of fraud on the court. *See Kup-*

*ferman v. Consolidated Research & Mfg. Co.*, 459 F.2d 1072 (2d Cir.1972); *see also England v. Doyle*, 281 F.2d 304, 310 (9th Cir.1960).

*Id.* (quoting *United States v. International Tel. & Tel. Corp.*, 349 F.Supp. 22, 29 (D.Conn.1972), *aff'd without opinion*, 410 U.S. 919, 93 S.Ct. 1363, 35 L.Ed.2d 582 (1973)).

▮ Because the fraud on the court and related sanction motions were filed prior to final judgment, the district court's finding that FNBL's conduct did not rise to the level of a fraud on the court is a finding made under the district court's inherent powers and is reviewed by this Court for abuse of discretion.[17] *Chaves v. M/V Medina Star*, 47 F.3d 153, 156 (5th Cir.1995). We find no abuse of discretion in this case.

The Sureties argue that the district court applied the incorrect legal standard by using Rule 60(b)(3) as the test for fraud on the court. The Sureties never objected or raised the issue of what legal standard should be applied to pre-judgment fraud-on-the-court claims. Assuming they did argue for the district court to apply a more lenient standard, the Sureties cite no authority for a more lenient standard to be used under the procedural posture of this case.

▮ We must make clear that we do not in any way condone the actions taken by FNBL in this case. Civil litigants should not in any way read this case to mean that they may attempt to influence a United States Attorney in a criminal case for their own

---

16. The Sureties proffered testimony of the Honorable Charles Clark, former Chief Judge of the Fifth Circuit; the Honorable Fred Cassibry, a former United States District Judge for the Eastern District of Louisiana; Benjamin R. Civiletti, former United States Attorney General; John Volz, former United States Attorney for the Eastern District of Louisiana; and Professor Geoffrey Hazard of Yale Law School. The testimony of these witnesses explained the improper nature and dangers of permitting civil litigants to influence pending criminal matters through their involvement with the drafting of agreements which may influence a pending civil claim. Testimony also revealed that Judge Ballentine should have recused himself from the criminal case involving DeWitt's plea. Merely explaining his involvement was not enough to cure the appearance of

Judge Ballentine's improper involvement with DeWitt's criminal case.

17. The Sureties argue that the district court relied on the wrong legal standard by applying FED.R.CIV.P. 60(b)(3) to deny their sanctions motion based on fraud on the court. Rule 60(b)(3) provides for relief from a final judgment procured by fraud, misrepresentation or other misconduct. However, the Sureties failed to make this argument at the district court and we will not consider this challenge on appeal. *North Alamo Water Supply Corp. v. City of San Juan, Texas*, 90 F.3d 910, 916 (5th Cir.1996). Even if an objection was raised to preserve this issue for our review, the Sureties fail to cite authority for a different or more lenient standard for claims in this procedural posture.

benefit in a companion civil case. Further, we express our dismay at Judge Ballentine's failure to automatically recuse himself from DeWitt's criminal case in light of his substantial interest in FNBL.[18] Nevertheless, we find no abuse of discretion with the district court's findings on this matter. No evidence was presented to show that Judge Ballentine was bribed or pressured by FNBL or anyone involved in this case. No evidence shows that any language included in the Superseding Information was fabricated.

Evidence does exist to show that FNBL engaged in the less egregious misconduct of failing to disclose to the district court that it was involved with the drafting of the Superseding Information. However, this conduct does not rise to the level necessary for a finding of fraud on the court. *See Kupferman*, 459 F.2d at 1072; *see also England*, 281 F.2d at 310. As such, based on this record, we cannot say that the district court abused its discretion by finding no fraud on the court in this case. For the reasons stated herein, we affirm the district court's finding that FNBL did not commit a fraud on the court and we affirm the district court's denial of the Sureties' Motion for Sanctions based on the fraud-on-the-court claim.

### F. Admissibility of the Guilty Pleas and Related Evidence

■ The Sureties argue that FNBL's involvement with the drafting of the Superseding Information coupled with Judge Ballentine's financial interest in FNBL's holding company tainted the plea and rendered it inherently unreliable. The Sureties contend that the district court erred by admitting DeWitt's guilty pleas and by excluding other expert testimony and affidavits relating to the guilty pleas.

■ We review evidentiary rulings for abuse of discretion and we will reverse a district court's decision based on an evidentiary ruling only if the ruling affects a substantial right of a party. *Marcel v. Placid Oil Co.*, 11 F.3d 563, 566 (5th Cir.1994). In this case, the district court followed our suggestion in *Lustig I* and admitted the guilty pleas simply as evidence to be considered by the jury, not as conclusive evidence of facts determined in DeWitt's prosecution. *See Lustig I*, 961 F.2d at 1165 (guilty pleas should receive the same treatment as any other piece of evidence). Further, the district court expressly instructed the jury that the guilty plea does not conclusively establish whether DeWitt acted with manifest intent to harm the bank and explained that the jury could give the plea whatever weight they deemed it deserved.

We find no abuse of discretion with the district court's admission of DeWitt's second guilty plea. The jury heard extensive evidence about FNBL's involvement with the drafting of the charging instrument. The jury received all the documents relating to FNBL's discussions with the United States Attorney's Office about the language in the Superseding Information. The Sureties also were allowed to present expert testimony to discredit the plea. After reviewing the record, we find that the district court did an excellent job of balancing the conflicting interests on this complex evidentiary issue and we affirm the court's decision to admit the guilty plea.

■ The Sureties also contend that the district court abused its discretion by refusing to admit testimony of two of its three experts to challenge the pleas. The jury was permitted to hear expert testimony from John Volz, a former United States Attorney, concerning federal prosecutorial practices and procedures. Volz testified that the contact between FNBL and the United States Attorney's Office was unprecedented, improper, and outrageous and that DeWitt's "guilty plea evidence of anything is worthless." However, the Sureties argue that the district court's exclusion of Judge Cassibry's

---

**18.** 28 U.S.C. § 455(b) provides that a judge shall recuse himself from any proceeding in any of the circumstances defined therein. Subpart (4) requires recusal when the judge has a "financial interest" in the case. Subsection (d)(4) defines "financial interest" as "ownership of a legal or equitable interest however small." 28 U.S.C. § 455(b), (d)(4); *and see Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 860–61, 108 S.Ct. 2194, 2202–03, 100 L.Ed.2d 855 (1988).

and Judge Clark's testimony substantially prejudiced the presentation of their defense.

The proposed testimony of these witnesses would have covered the same ground as the testimony of Volz. Judge Cassibry would have opined on the whole series of events that took place between FNBL and the United States Attorney's Office. He also would have offered his opinion as to the credibility of the Assistant United States Attorney, Taft, and other FNBL witnesses. The district court ultimately excluded Judge Cassibry's testimony because it would improperly instruct the jury on the law, it would be cumulative of Volz's testimony, and would not assist the jury in reaching a verdict. *See United States v. Wertis,* 505 F.2d 683, 685 (5th Cir.1974), *cert. denied,* 422 U.S. 1045, 95 S.Ct. 2662, 45 L.Ed.2d 697 (1975) (district court excluded expert testimony as to whether a jury should believe the testimony of another witness). Judge Clark would have offered his opinion about FNBL's conduct in suggesting language to include in the Superseding Information. The district court excluded Judge Clark's testimony as cumulative of Volz's testimony.

The district court permitted the jury to hear extensive evidence about the circumstances surrounding DeWitt's guilty pleas. The facsimiles were admitted to show that FNBL communicated with the Assistant United States Attorney and lobbied for the inclusion of the disputed language in the Superseding Information. Volz testified at length about the propriety of FNBL's involvement in the drafting of DeWitt's charging instrument. Based on the admitted testimony, we find no abuse of discretion with the district court's decision to limit the cumulative testimony which would have been offered by Judges Cassibry and Clark.

■ Finally, the Sureties contend that the district court committed reversible error by refusing to admit affidavits of Sonia Morton, FNBL's principle witness, for impeachment purposes. The district court excluded these affidavits because they related to the previously decided fraud-on-the-court issue. The affidavits contained Morton's assertions of how the language favorable to FNBL got included in the Superseding Information.

The Sureties maintain that the affidavits were relevant to the reliability of the guilty pleas and should have been admitted for impeachment purposes. The Sureties also contend that the fact that the affidavits were related to the fraud-on-the-court issue should not have been dispositive of their admissibility.

FNBL argues that Morton never testified to the points addressed by the affidavits and, therefore, there was no inconsistency between her trial testimony and the affidavits. Further, FNBL contends that the affidavits relate to the fraud-on-the-court issues that the district court previously excluded from trial.

After reviewing the record, we cannot say that the district court abused its discretion by refusing to admit the Morton affidavits. Morton never testified about the specific acts related by the affidavits and, as a result, she could not be impeached on those grounds. Further, the affidavits contained statements relating to the fraud-on-the-court issue which had previously been decided by the trial court. The affidavits added nothing new to the evidence already admitted on the reliability of the guilty pleas and the conduct of FNBL and the United States Attorney's Office. For these reasons, we find no abuse of discretion with the district court's decision to exclude the Morton affidavits.

### G. *Other Evidentiary Challenges*

■ The Sureties argue that the testimony of Morton, an FNBL employee and designated representative, and Sterland Greenhalgh, a private investigator, should have been excluded because their testimony contained hearsay, improper opinion testimony and other incomplete evidence. The Sureties contend that Morton had no personal knowledge of what FNBL's loan committee relied upon in approving the DeWitt loans. Morton was not a member of the loan committee and did not attend the loan committee meetings. The Sureties argue, therefore, that Morton's hearsay testimony should not have been admitted.

Greenhalgh testified as an expert in civil fraud detection and investigation. He re-

viewed documents and interviewed witnesses about the DeWitt loans at issue. The district court admitted his testimony that the loan committee relied heavily on DeWitt's misrepresentations in approving the loans even though he had no personal knowledge of this fact. The Sureties contend that Greenhalgh's testimony is also hearsay and should have been excluded.

After reviewing the record, we cannot say that the district court erred in admitting the testimony of Morton and Greenhalgh. Rule 602 provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness himself." FED.R.EVID. 602. FNBL had the burden to show that Morton had sufficient personal knowledge to testify as to the reliance of the FNBL loan committee on the veracity of the information contained in DeWitt's loan submissions. Morton testified that she worked for FNBL for many years and was intimately familiar with the role of the account officer and the reliance that the loan committee places on those officers to provide accurate and truthful information. The jury knew that Morton was not present at the DeWitt loan committee meetings and could take that fact into account in weighing the reliability of her testimony. FNBL's business records relating to the DeWitt loans were admitted without objection. Morton's testimony and DeWitt's records relating to the eight loans at issue presented direct evidence that the jury could consider in determining what the loan committee considered and relied on in approving these loans.

The important question is not whether the trial court improperly admitted hearsay testimony, but whether Morton had adequate knowledge to testify as to the normal practice followed by the FNBL loan committee in approving loans. *See* FED.R.EVID. 406; *United States v. Quezada*, 754 F.2d 1190, 1195 (5th Cir.1985) (even if testimony is based on inadmissible hearsay, Rule 602 may be satisfied if the sufficient evidence shows that the witness has personal knowledge of the matter). We find that Morton had suffi-

cient knowledge to testify as to the loan approval procedures of the loan committee and the bank itself. While Morton did not physically observe DeWitt's loan committee meetings, we believe her knowledge is sufficient to permit the conclusion that Morton was familiar with the procedure. The testimony permits the conclusion that the loan committee would rely on the veracity of the loan officer's paperwork in deciding whether to approve a loan. Therefore, we find no reversible error with the district court's admission of Morton's testimony.

We also find no abuse of discretion with the district court's admission of Greenhalgh's testimony. Greenhalgh explained that his testimony in this case was derived from his conclusions from the knowledge he obtained through his investigation. Experts may rely on hearsay evidence in forming their opinions. *Moss v. Ole South Real Estate, Inc.*, 933 F.2d 1300, 1309 (5th Cir.1991). This was a complicated bank fraud coverage case that required explanations of FNBL's operations, loan approval procedures, and the transactions themselves. We find no abuse of discretion in permitting expert testimony by Greenhalgh about these processes and procedures.

### H. Special Interrogatories

The Sureties contend that the district court erred in submitting special interrogatories to the jury during the coverage phase of the trial. FNBL's coverage claim was based on eight loan transactions. To recover under each loan, the jury had to find manifest intent and causation with respect to each loan transaction. We afford the district court great latitude in framing and structuring special interrogatories and we review the formulation of jury interrogatories for abuse of discretion. *E.E.O.C. v. Manville Sales Corp.*, 27 F.3d 1089, 1096 (5th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1252, 131 L.Ed.2d 133 (1995).

Interrogatory 1 on the jury verdict form asked whether FNBL satisfied its burden of proof as to manifest intent "on any of the eight loans involved in this case." Interrogatory 2 asked whether FNBL satisfied its burden of proof to show causation with re-

spect to "any of the eight loans involved in this case." The jury was required to answer Interrogatory 5 after answering "yes" to the first two interrogatories. Interrogatory 5 stated, "[i]n the blanks provided below, list the amount of loss, if any, you find that the bank has proved by a preponderance of the evidence that it suffered on each of the loans." The district court also explained to the jury that FNBL was required to prove the elements of coverage on each of the eight loans.

 In determining the propriety of special interrogatories, we inquire into several specific factors:

(i) whether, when read as a whole in conjunction with the general charge the interrogatories adequately presented the contested issues to the jury; (ii) whether the submission of the issues to the jury was "fair"; and (iii) whether the "ultimate questions of fact" were clearly submitted to the jury.

*Barton's Disposal Serv., Inc. v. Tiger Corp.,* 886 F.2d 1430, 1435 (5th Cir.1990) (quoting *Dreiling v. General Elec. Co.,* 511 F.2d 768, 774 (5th Cir.1975)). The Sureties contend that the interrogatories did not require the jury to make an independent evaluation as to manifest intent and causation for each of the eight loans at issue. Therefore, the Sureties maintain that the interrogatories were incorrect, prejudicial and misled and confused the jury. FNBL argues that the Sureties discussed this possible confusion during closing argument and explained that the jury was obligated to consider each loan separately.

Although these interrogatories were not as clear as possible, the record shows that the jury apparently followed the instructions given when they returned a verdict awarding zero for one of the eight loans. We find that these interrogatories did not prejudice the jury's ability to reach a decision in this case. The interrogatories met the three part *Dreiling* test and finding no abuse of discretion, we affirm the district court's judgment on these grounds.

## CONCLUSION

For the foregoing reasons, we hold that the district court erred in submitting FNBL's bad faith claim to the jury. Therefore, we reverse the judgment awarding FNBL consequential damages on its bad faith claim and render judgment that FNBL take nothing on this claim. We also reverse the district court's judgment awarding attorney's fees arising from FNBL's bad faith claim and render judgment that FNBL take nothing on such claim.

As to the remaining claims, we affirm the district court's decision to permit FNBL to apply the sales proceeds of the loans at issue to interest due. We also affirm the district court's rulings on the fraud on the court and sanctions claims filed by the Sureties. Accordingly, we deny the Sureties' motion for sanctions filed in this Court. Further, we find no abuse of discretion with the district court's evidentiary rulings and affirm those rulings in all respects. We leave intact the judgment in favor of FNBL for recovery against the Sureties on the bond.